

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
02/03/2010

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 08-32362-H4-11 |
| WILL CLAY PERRY, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| DAVID WALLACE, COSTA BAJJALI, | § | |
| JACQUELYN MARIE WALLACE 1996 | § | |
| SUB-S TRUST AND WHITNEY LEIGH | § | |
| WALLACE 1996 SUB-S TRUST, | § | Adversary No. 08-03299 |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| WILL CLAY PERRY, | § | |
| Defendant. | § | |
| | § | |
| | § | |

**MEMORANDUM OPINION RELATING TO COMPLAINT TO DETERMINE**
**DISCHARGEABILITY OF DEBT**
[Adv. Docket No. 1]

## I. INTRODUCTION

This Memorandum Opinion relates to a lengthy, multi-day trial over a dischargeability complaint involving numerous state law issues. These issues include, but are not limited to, breach of contract and state law defamation claims. The Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052.[1] To the extent that any

---

[1] Reference to a "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure. Any reference herein to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a "Rule" refers to the Federal Rules of Civil Procedure.

finding of fact is construed as a conclusion of law, it is adopted as such.  Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such.  The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

## II. BRIEF PROCEDURAL BACKGROUND

On August 20, 2008, the plaintiffs filed their Complaint to Determine Dischargeability of Debt. [Adv. Docket No. 1.] The plaintiffs brought this suit under § 523 (a)(2), (4), & (6).  However, in an order issued by this Court on March 17, 2009, sanctioning the plaintiffs for discovery abuse, this Court struck all causes of action concerning dischargeability brought under §§ 523(a)(2) & (a)(4); hence, the only manner in which the plaintiffs could obtain a judgment of nondischargeability in this adversary proceeding would be to successfully prove the elements of § 523(a)(6).  [Adv. Docket No. 37.]  The trial in this suit was therefore whether the defendant (who is the debtor in the main case) owes debts to the plaintiffs based upon breach of contract (failure to abide by a nondisparagement clause and failure to indemnify), defamation, breach of fiduciary duty, and fraud, and whether such debts are non-dischargeable because they arose due to the debtor's willful and malicious injury of the plaintiffs.[2]

The trial in this case lasted twelve days.  Specifically, trial was held on the following days in 2009: June 1, June 2, June 3, June 4, June 5, June 19, June 23, June 24, June 25, July 14, July 20, and July 24.

---

[2]  The Court wishes to make clear that this Court sanctioned the plaintiffs due to misconduct of their initial counsel of record, whom the plaintiffs replaced with Johnie J. Patterson. [Adv. Docket No. 25.] Mr. Patterson's conduct throughout his representation of the plaintiffs was exemplary, as was the conduct of counsel for the defendant, John W. Wauson.

## III. FINDINGS OF FACT

A.    General Background

1.    On or about October 22, 2004, Will Clay Perry (Perry or the Debtor) and Costa
      Bajjali (Bajjali) became partners in W.C. Perry Properties, LP (Perry Properties or
      the Partnership).  [Adv. Docket No. 87, p. 13, ¶ V.–A.]

2.    In January of 2005, the Jacquelyn Marie Wallace 1996 Sub-S Trust and the Whitney
      Leigh Wallace 1996 Sub-S Trust (collectively, the Wallace Trusts) also became
      partners in Perry Properties.  Jacquelyn Marie Wallace and Whitney Leigh Wallace
      are the daughters of David Wallace (Wallace), one of the plaintiffs in this adversary
      proceeding number 08-03299 (the Adversary Proceeding).  Each trust held a one-
      sixth (1/6) partnership interest in Perry Properties.  Thus, collectively, the Wallace
      Trusts held a one-third 1/3 partnership interest in Perry Properties, as evidenced by
      the January, 2005 partnership agreement (the Partnership Agreement).  [Adv. Docket
      No. 87, p. 13, ¶ V.–B.]  Wallace himself was never a partner in Perry Properties,
      either before or after the Wallace Trusts became partners.  [Pls.' Ex. Nos. 2 & 3.]

3.    While they were partners, Perry and Bajjali entered into two agreements regarding
      a certain tract of real estate known as the Imperial property (the Imperial Property).[3]
      As part of the Imperial Property transaction (the Imperial Property Transaction),
      Perry signed and executed a $50,000.00 note payable to Bajjali.  [Adv. Docket No.
      87, p. 13, ¶ V.–D.]

---

[3]  In 2004, Bajjali and Perry became partners in a real estate development venture; their first transaction was
to purchase and refurbish the Imperial Sugar plant located in Fort Bend County, Texas.  [June 1, 2009 Tr. 67:18–69:13.]

3

4.      Effective on November 15, 2006, Perry purchased all of the partnership interests in Perry Properties owned by Bajjali and the Wallace Trusts, the details of which are set forth in a signed purchase agreement (the Purchase Agreement). [Adv. Docket No. 87, p. 13, ¶ V.–C.] The Purchase Agreement defines Bajjali and the Wallace Trusts as "Sellers." [Pls.' Ex. No. 4, p. 1, ¶ 5, pp. 8–10.] When he testified at trial, Wallace admitted that the Purchase Agreement did not involve him as a partner. [June 23, 2009 Tr. 109:17–19.] Moreover, Wallace admitted that when he filed his proof of claim, he did not have a guaranty from Perry. [June 23, 2009 Tr. 123:3–13.]

5.      Effective on November 14, 2006, Perry, in his capacity as manager of W.C. Perry Real Estate Group, L.L.C. (the Perry Group), executed the Agreement Regarding Origination Fees (the Origination Agreement), relating to the Imperial Property Transaction. [Adv. Docket No. 87, p. 13, ¶ V.–E.] Perry, in his individual capacity, guaranteed payment and performance as part of the Origination Agreement. [Adv. Docket No. 87, p. 13, ¶ V.–G.]

6.      Perry filed a Chapter 11 petition on April 11, 2008. [Docket No. 1.] At that time, Wallace and Bajjali had pending causes of action in state court against Perry for defamation and breach of contract, styled: *W.C. Perry Properties, LP, et al. v. R.D. Tanner, et al.*, Cause No. 07-CV-154130, in the District Court of Fort Bend County, Texas, 400th Judicial District. [Adv. Docket No. 87, p. 13, ¶ V.–H.]

B.      Perry's Background and Contacts with Certain Individuals

7.      Perry obtained a B.B.A. degree in business management operations and a M.B.A. in business finance from Loyola University in Chicago, Illinois. [June 1, 2009 Tr.

4

30:12–23.] Perry received his MBA in 1997. [June 1, 2009 Tr. 30:22–25.] Additionally, Perry has been a licensed real estate broker since the autumn of 2001. [June 1, 2009 Tr. 31:9–15.] He is a sophisticated businessman.

8.     Perry has extensive experience in commercial real estate development. [June 1, 2009 Tr. 31:1–32:14.]

9.     John Lunsford (Lunsford), an investor involved in radio media, met Perry, Wallace, and Bajjali while consulting for BizRadio—a Texas-based radio station specializing in business news and strategies—at an event in New York City. [June 3, 2009 Tr. 10:15–11:14.]

10.     Around 2005 or 2006, Daniel Frishberg (Frishberg), a former business associate of Perry, invested substantial amounts of his clients' money with Perry Properties. [June 3, 2009 Tr. 34:9–35:20.] Frishberg, a BizRadio talk show host, is a manager of assets for individuals and institutions valued collectively at approximately $1.5 billion. Out of that amount, approximately $200 million are available to invest at Frishberg's discretion. [June 3, 2009 Tr. 33:9–17.]

11.     Within Perry Properties, Perry was responsible for brokerage activities, Bajjali was responsible for the real estate development activities, and Wallace was responsible for both finance and private equity activities. [June 4, 2009 Tr. 166:22–167:2.]

12.     Sylvia Hoffman (Hoffman) served as Perry's administrative assistant from February of 2006 until 2008. [June 1, 2009 Tr. 100:21–23; 102:5–6.] Based upon certain testimony adduced, and certain exhibits introduced, at trial, this Court also finds that Hoffman was Perry's confidant during her tenure as his administrative assistant.

C.    Wallace's Background and Contacts with Certain Individuals

    13.    Wallace has developed real estate and invested in private equity ventures for a number of years.  [June 4, 2009 Tr. 161:17–20.]  Indeed, with an extensive background in real estate development, Wallace has held numerous positions in investment banking companies that operate in real estate development. [June 5, 2009 Tr. 80:12–99:5.]  Moreover, Wallace has dealt in the purchase and sale of troubled businesses. [June 5, 2009 Tr. 11:22–12:18.]  He is a sophisticated businessman.

    14.    Mark Thatcher (Thatcher), the son of Margaret Thatcher, the former Prime Minister of England, had a business relationship with Wallace.  Their business consisted of operating investment banks buying troubled assets, buying troubled companies, and buying bankrupt companies.  As early as 2002, stories circulated that Wallace and Thatcher participated in arms sales.  Wallace convincingly testified, however, that he was never aware of any arms dealings by Thatcher nor was he himself involved in arms dealings. [June 4, 2009 Tr. 181:22–182:11; June 5, 2009 Tr. 5:24–6:3; June 19, 2009 Tr. 20:21–21:17.]

    15.    Contrary to statements made about him, Wallace also convincingly testified that he was never involved in a plot to overthrow the government of Equatorial Guinea. [June 5, 2009 Tr. 6:4–9.]  This Court finds that not only were the statements published by Perry about Wallace involving himself in a plot to overthrow the government of Equatorial Guinea false, but all of the defamatory allegations made or published by Perry against Wallace were false.

    16.    Wallace met Bajjali through Perry. [June 4, 2009 Tr. 164:22–25.]

17.  Wallace's political career began in May of 2001 when he was elected to the City Council of the City of Sugar Land, Texas.  He then decided to run for Mayor of the City of Sugar Land against the incumbent mayor, Dean Hrbacek.  Wallace subsequently received threats to himself, his family, and his business as a result of his candidacy.  Despite the threats, Wallace was elected and served as mayor from 2002 to 2008.  [June 4, 2009 Tr. 163:11–16; June 19, 2009 Tr. 14:21–18:19.]

18.  McGrath, who has, or has had, business interests in both Houston, Harris County, Texas, and Sugar Land, Fort Bend County, Texas—for example, he is the owner of Asset Plus Corporation and a former member of the investment committee for Perry Properties—was introduced to Perry by Wallace in 2006. McGrath is a sophisticated businessman.  At one point, he acted as the trustee for the Wallace Trusts. Additionally, McGrath has known Wallace for approximately fourteen years because he was a soccer coach for Wallace's daughters.  McGrath also knows Bajjali through both Wallace and Perry. [June 3, 2009 Tr. 113:6–114:8; 123:11–19; 124:5–125:6.]

19.  Eric Thode (Thode), former Republican Party Chairman of Fort Bend County, Texas, has known Wallace since the early 1990s through mutual political contacts.  [June 3, 2009 Tr. 135:7–13.]  Thode has also known Perry since 2003 or 2004 through political activities in Fort Bend County, Texas.  [June 3, 2009 Tr. 134:18–135:1; 136:24–137:6.]

20.  Bert Keller (Keller), a real estate consultant, met Wallace while Wallace was mayor of Sugar Land and Keller was a candidate for District G Houston City Council.  [June 3, 2009 Tr. 151:11–152:4.]

7

D.    Bajjali's Background

21.    Prior to 2004, for two years, Bajjali was the global program manager for Dell
Corporation. [June 25, 2009 Tr. 107:7–13.] In 2004, Bajjali began working in the
development side of real estate. [June 25, 2009 Tr. 108:10–15.] The Court finds
that Bajjali is a sophisticated businessman who has a very reputable record and
reputation in his professional career, and this Court finds that all of the defamatory
allegations made by Perry against Bajjali to be false.

22.    Bajjali testified convincingly, and this Court so finds, that he has never committed
a crime, been investigated for a crime, or been indicted for a crime. [June 25, 2009
Tr. 93:16–94:1.]

E.    Bob Perry's Background

23.    Bob Perry, who is Perry's father and an extremely successful businessman, has been
the CEO of Perry Homes for forty-one years and has never been involved in his son's
business. [June 5, 2009 Tr. 123:18–124:18.]

24.    Bob Perry met Wallace while Wallace was the mayor of Sugar Land. [June 5, 2009
Tr. 131:11–18.]

25.    Bob Perry does not generally discuss business, politics, or finances with his children,
but would give his children advice on which political candidates to support. [June
5, 2009 Tr. 136:21–137:24.] Indeed, as soon as Perry earned his real estate brokers'
license, Bob Perry kept his business separate and apart from his son's business. On
rare occasions, however, Perry Homes' Land Developers, one of Bob Perry's

8

businesses, purchased land that Perry had brought to its attention. [June 5, 2009 Tr. 179:12–180:7.]

F.    Formation of Perry Properties

26.    In approximately 2003, Perry and Bajjali were introduced to each other. In 2004, Bajjali and Perry became partners in a real estate development venture; their first deal was to purchase and refurbish the Imperial Property. [June 1, 2009 Tr. 67:18–69:13.]

27.    In coming on board to the Partnership's management, Wallace brought real estate development expertise to Perry Properties.[4] Wallace's expertise would allow the Partnership to generate equity capital and development fees. [June 5, 2009 Tr. 86:12–23.]

28.    In 2005, Perry Properties established the W.C. Perry Properties Realty Fund, L.P., a Texas limited partnership (the Fund). Soon after its establishment, the Fund completed an offering in which it received capital commitments in excess of $3.5 million. The Fund was engaged in various aspects of real-estate business, and Perry Properties had investments in the Fund.[5]

---

[4] Wallace joined Perry Properties as part of its management team, but he never became a partner in Perry Properties. The Court also notes that in various e-mails introduced into evidence, Wallace is referred to as a "partner." The Court finds that such a reference meant not that Wallace was a partner in the formal legal capacity as were Perry, Bajjali, and the Wallace Trusts, but rather that he was one of the individuals (along with Perry and Bajjali) responsible for running the operations of Perry Properties [Finding of Fact No. 11.]. Despite the fact that Wallace was not legally a partner of Perry Properties, there can be no doubt that Wallace was as interested in the financial well-being and success of Perry Properties as Perry and Bajjali were. This is so because the trusts of Wallace's two daughters were, together with Perry and Bajjali, the formal partners of Perry Properties pursuant to a written document (i.e., the Partnership Agreement). However, the trustee of the Wallace Trusts (i.e., McGrath, until his resignation) never was involved in the day-to-day operations of Perry Properties; rather, Wallace, Perry, and Bajjali were running the day-to-day operations.

[5] For a lengthier discussion of the history of the Fund, see this Court's Memorandum Opinion Regarding Debtor's Objections to Proofs of Claim Number 38, 39, and 40. [Main Case, Docket No. 606]; *In re Perry*, 404 B.R. 196 (Bankr. S.D. Tex. 2009). In the Fifth Circuit, collateral estoppel (i.e., issue preclusion) is generally applied when "'(i) the issue to be precluded [is] identical to that involved in the prior action, (ii)in the prior action the issue [was]

G.     Dissension at, and Eventual Dissolution of, Perry Properties

29.     Wallace had concerns regarding Perry's spending habits, which caused conflict within the Partnership. Perry frequently spent afternoons at the movies instead of working. [June 4, 2009 Tr. 168:2–8; 169:1–2.] Additionally, Perry made business deals without Wallace's or Bajjali's permission, and without the knowledge of investors. [June 5, 2009 Tr. 30:14–23.] Moreover, Perry stopped attending the Partnership meetings in approximately August of 2006. [June 4, 2009 Tr. 169:11–170:12; June 25, 2009 Tr. 64:17–65:1.]

30.     Perry testified that Wallace's political activities became a liability to the Partnership. [June 1, 2009 Tr. 81:2–83:6.] Additionally, Perry testified that Bajjali, Wallace, and he (i.e., Perry) were unable to effectively communicate with each other. [June 2, 2009 Tr. 302:4–24]. On August 24, 2006, Wallace suggested in an e-mail that the Partnership wind down. [June 4, 2009 Tr. 13:17–19]; [Pls.' Ex. No. 45.] Perry testified that until Wallace's August 24, 2006 e-mail suggesting that the Partnership wind down, Perry had been trying to make the Partnership work. [June 1, 2009 Tr. 244:9–23.] Wallace's e-mail led to Perry's desire to terminate the Partnership. [June 3, 2009 Tr. 214:20–215:6]; [Pls.' Ex. No. 45.]

31.     Subsequently, Perry asserted that Bajjali left him a voice mail threatening him with bodily harm. He also asserted that Bajjali lurched at him in the office kitchen. The

---

actually litigated, and (iii) the determination of the issue in the prior action [was] necessary to the resulting judgment.'" *Berry v. Vollbracht (In re Vollbracht)*, 276 Fed. App'x 360, 363 (5th Cir. 2007) (quoting *In re Shuler*, 722 F.2d 1242, 1256 n.2 (5th Cir. 1984)). For purposes of this Memorandum Opinion, the Court adopts findings of fact numbers 2 and 11 from this Court's prior memorandum opinion in main case docket number 606. These particular findings of fact concern the history of the Fund.

same week, Perry concluded that he needed a bodyguard to be present in the office.
[June 1, 2009 Tr. 198:2–11.]

32. Patricia Glover (Glover), a former employee of Perry Properties, credibly testified
that in her opinion, Perry had no reason to physically fear Bajjali. [June 2, 2009 Tr.
177:7–12.] The Court finds that Perry's testimony is not credible that: (a) Bajjali was
physically threatening Perry; (b) Perry needed a bodyguard; and (c) Bajjali would
actually harm Perry.

33. Further strain was put on the Partnership when Wallace—before informing his
partners—announced that he would be running for a congressional seat in
Congressional District Number 22. Wallace admitted that both Bajjali and Perry were
concerned about the impact the election would have on the Partnership. Wallace
subsequently asked Perry to speak with Perry's father, Bob Perry, about supporting
Wallace's campaign. [June 1, 2009 Tr. 75:5–76:9]; [June 19, 2009 Tr. 39:23–40:8;
40:20–41:21; 47:15–48:8.]

34. Lunsford, an investor in real-estate properties involving Perry Properties, testified
that in January of 2007, Frishberg asked him to evaluate the solvency and status of
Perry Properties because Frishberg was concerned about the Partnership's future.
[June 3, 2009 Tr. 12:13–14:14.] Lunsford testified that on January 10, 2007, he had
his first meeting to evaluate the Fund with Perry and Reagan Tielke (Tielke).[6] [June
3, 2009 Tr. 15:24–16:8.] Lunsford reported his findings to Frishberg and Albert

---

[6] Tielke is a former employee of Perry Properties. [June 2, 2009 Tr. 111:1–18.] After Wallace and Bajjali left
Perry Properties, Tielke assumed the position of Chief Financial Officer of Perry Properties. [June 2, 2009 Tr. 113:11.]

11

Kaleta (Kaleta),[7] but not Perry, Bajjali, or Wallace.  [June 3, 2009 Tr. 27:3–15.] Lunsford explored the option of removing the general partner—i.e., Perry—but determined it would be too expensive for the investors of the Fund.  [June 3, 2009 Tr. 28:10–25.]

35.     During the initial meeting with Lunsford, on January 10, 2007, Perry requested more money for the Fund.  [June 3, 2009 Tr. 16:7–25.]  Lunsford lacked confidence in Perry's abilities as a general partner because Lunsford rarely received satisfactory answers to his questions, saw no progress, and observed near foreclosure on all of the Partnership properties.  [June 3, 2009 Tr. 29:1–23.] According to Lunsford, if there was ever a problem concerning a Partnership project, Perry always laid blame on Wallace and Bajjali.  [June 3, 2009 Tr. 21:4–18.]  Thereafter, in 2007, Perry was unable to raise additional funds from Frishberg and his investors for other funds run by Perry.  [June 3, 2009 Tr. 22:18–23:1.]

36.     On September 9, 2006, Perry sent an e-mail to Hoffman, Perry's administrative assistant and confidant, cancelling all Partnership meetings.  [June 4, 2009 Tr. 20:8–22:20]; [Pls.' Ex. No. 42.]

37.     Because the tension and bitterness between Perry, on the one hand, and Wallace and Bajjali, on the other, reached an intolerable level, these three individuals decided that a parting of the ways needed to take place.  Negotiations thereafter ensued and it was decided that Perry would purchase the Partnership interests of Bajjali and the

---

[7] Kaleta is a financial planner and analyst for Frishberg & Kaleta Capital Management.  [June 2, 2009 Tr. 212:4–19.]

Wallace Trusts.[8] Thereafter, the partners of the Partnership entered into the Purchase Agreement. The Purchase Agreement, dated November 15, 2006, outlined the obligations of Perry, the Wallace Trusts, and Bajjali in relation to the sale of the Partnership interests owned by the Wallace Trusts and Bajjali. [Pls.' Ex. No. 4.]

38.   At trial, Perry admitted that the Purchase Agreement was a binding contract and carried with it many obligations. [June 4, 2009 Tr. 138:1–6.] Pursuant to the Purchase Agreement, Wallace and Bajjali relinquished their positions as managers of various entities that the Fund owned, [June 4, 2009 Tr. 89:22–90:5], all of which had a direct and important financial impact on Perry Properties.

39.   Roger Arora (Arora),[9] an investor in the Fund, testified that he loaned $450,000.00 to Perry so that Perry could purchase all of the interests in the Partnership owned by Bajjali and the Wallace Trusts.[10] [June 2, 2009 Tr. 163:19–25.]

40.   Perry recalled paying back Arora, in part, for the $450,000.00 he borrowed from Arora. Perry also admitted, however, that he did not entirely pay off the loan, but rather paid three installments of $10,000.00, all of which came from the Fund. [June

---

[8]   Once again, Wallace himself was never a partner of Perry Properties. The trusts of his two children—the so-called Wallace Trusts—were, however, partners of Perry Properties, and Perry decided to purchase their interests in the Partnership.

[9]   Arora is in the wholesale clothing business and also is involved in real estate development. [June 2, 2009 Tr. 160:21–5; 162:3–4.]

[10]   The transcript reflects that in his testimony, Arora referred to Perry buying out "Costa [Bajjali] and David's [Wallace's] share." In fact, Perry bought out the interests of Bajjali and the Wallace Trusts, not any interest of Wallace (who never held any Partnership interest). The reference to "David's share" is really a reference to the shares held by the Wallace Trusts (i.e., the trusts for Wallace's two daughters). Thus, a reference to "Wallace" is simply a short-hand reference to the Wallace Trusts.

13

1, 2009 Tr. 191:13–192:20.]  Arora testified that Perry has yet to repay the loan, except for the three installments of $10,000.00.  [June 2, 2009 Tr. 164:4–15.]

41.    Upon hearing of the demise of Perry Properties, Frishberg summoned both Wallace and Perry into his office in order to inform them that they needed to mend the Partnership because they had a duty to their investors.  Perry, however, lost his temper, refused to attend the meeting, and made it clear he would not meet regarding the disintegration of Perry Properties. [June 3, 2009 Tr. 38:12–40:22; 41:1–20; 49:22–50:8.]

H.    Perry's Communications with Others

42.    Tielke conceded at trial that Perry made less than flattering remarks about Wallace and Bajjali to Tielke.  [June 2, 2009 Tr. 114:13–16.]

43.    It was Tielke's understanding that Wallace and Bajjali had been paid in full. [June 2, 2009 Tr. 116:9–11.]  The Court finds that aside from this testimony given by Tielke, Perry introduced no other evidence suggesting that Perry had paid Wallace and Bajjali in full.  The Court finds that Tielke's understanding was incorrect and that Wallace and Bajjali have not been paid in full by Perry.

44.    Taseer Badar (Badar), an investment banker with substantial investments in projects of Perry Properties, was asked by Tielke to be a general partner; Badar declined. Badar has never spoken directly with Perry about Wallace. [June 2, 2009 Tr. 90:23–24; 99:21–100:12.]

45.    James Grady Prestage (Prestage), a Fort Bend County Commissioner, had a phone conversation with Perry.  In that phone conversation, Perry made the following

14

threat: "Don't f--- with me, I will destroy you like I did David Wallace."[11]   [June 2, 2009 Tr. 130:17; 133:11–14.]

46.     Frishberg and Kaleta, a financial planner and analyst for Frishberg and Kaleta Capital Management, were both heavily invested in Perry Properties.   On numerous occasions, Perry told Kaleta that big changes were about to happen at Perry Properties. Kaleta was concerned about what those changes would be. [June 2, 2009 Tr. 212:6–7; 215:5–216:1.]

47.     Perry believed Wallace and Bajjali were receiving kickbacks because Perry was lacking certain accounting records.  Specifically, Perry asserted that there were no accounting records for the tenant improvement buildout.  Perry communicated to a number of people—Dinesh Shah, Pritesh Shah (collectively, the Shahs),[12] Hoffman, Tielke, and Arora—that Wallace and Bajjali were receiving kickbacks. Perry equated these alleged kickbacks to stealing.  Perry informed the Shahs through e-mail, but did not disclose in his testimony the form of communication used to inform Arora, Tielke, and Hoffman.  [June 2, 2009 Tr. 59:22–24; 75:2–76:12; 291:18–292:19]; [June 4, 2009 Tr. 60:17–24.]

48.     Lunsford inquired on January 10, 2007 as to why Wallace and Bajjali had departed from their business relationship with Perry.  Perry responded by informing Lunsford that Wallace was performing his duties incompetently and stated that for the

---

[11]   The Court declines to repeat the aforementioned vulgar word in its entirety.

[12]   The Shahs are two brothers who were joint venturers with Perry Properties in a real estate investment. [June 3, 2009 Tr. 22:5–13.]

investors' sake, Perry had taken over.  [June 3, 2009 Tr. 16:2–18:6.]  Lunsford

further testified that Perry frequently called Wallace incompetent and a dishonest

businessman.  [June 3, 2009 Tr. 18:19–19:3.]

49.     Lunsford also testified that Perry asserted that funds improperly went to Bajjali.

Lunsford believes Perry's assertions could be construed as an accusation of breach

of fiduciary duty or fraud.  [June 3, 2009 Tr. 19:4–20:24.]

50.     In conversations with Frishberg, a substantial investor in projects of Perry Properties,

Perry made comments to Frishberg about Wallace and Bajjali being crooks and

incompetent.  [June 3, 2009 Tr. 72:6–22.]  Perry accused Wallace of forging Perry's

name on a real estate commission check and told Frishberg that Wallace would end

up in jail for the alleged forgery.  [June 3, 2009 Tr. 44:3–11; 45:10–24.]  Frishberg's

investors did not want someone guilty of a crime, such as forgery, presenting them

with investment opportunities.  [June 3, 2009 Tr. 47:16–20.]

51.     Perry informed Frishberg that, among other things, Wallace participated in selling

weapons to Saudi Arabia, embezzled funds, and failed to pay a judgment to a bank.

[June 3, 2009 Tr. 75:13–18.]  Perry never told Frishberg, however, that Bajjali had

committed any crime.  [June 3, 2009 Tr. 75:23–76:1.]

52.     Perry made negative comments about Wallace to Walters,  a fellow member of the

Sugar Land Rotary Club, during the 2006–2007 time period.  [June 3, 2009 Tr.

96:2–20.]  Perry never gave Walters any details or reasons as to why Perry was

critical of Wallace. [June 3, 2009 Tr. 96:24–97:1.]   Walters, along with others,

received an e-mail from Perry advising the recipients not to associate with Wallace or Bajjali. [June 3, 2009 Tr. 98:14–21.]

53.    McGrath, the former trustee of the Wallace Trusts and a businessman himself, received text messages containing statements from Perry that implied Wallace and Bajjali had committed fraud in regards to the Fund, but could not recall the details of the message because he did not take the text messages seriously. [June 3, 2009 Tr. 121:20–123:4.]

54.    Thode, former Republican Party Chairman of Fort Bend County, Texas, had phone conversations with Perry regarding changes in relation to Perry Properties. [June 3, 2009 Tr. 136:15–23.] Additionally, Thode called Perry to set up a meeting between Perry and Gary Gillen (Gillen), the 2007 Fort Bend County Chairman of the Republican Party, but Perry stated he had no interest in meeting with him because Gillen was a friend of Wallace. According to Thode, Perry then stated—not in these precise words—that Wallace was a crook, had ripped Perry off, and had stolen property from Perry; and that anyone associated with Wallace was "not worth a dime." [June 3, 2009 Tr. 137:1–139:19.]

55.    Keller, a real estate consultant, testified that in a business meeting with Perry, Perry stated that "David Wallace is a crook." [June 3, 2009 Tr. 153:2–154:1.]

56.    Perry told other people that Wallace and Bajjali did not pay their bills on time. [June 4, 2009 Tr. 50:22–25.]

57.    Perry sent Wallace and Bajjali unprofessional text messages during the pendency of his lawsuit against them. For example, Perry sent the following taunting text

17

message to Wallace and Bajjali: "[c]an't pay your attorney's fees?  Now this is getting fun.  You guys tired yet?  And will you ever learn you cant win?"  [June 4, 2009 Tr. 56:18–57:3.]

*a.     The "Trick" E-mail*

58.     On September 24, 2006, Perry sent what he referred to as a "trick" e-mail.  According to Perry, the purpose of this "trick" e-mail was to trap Bajjali, who Perry thought was secretly looking at his e-mails.  The "trick" e-mail was an e-mail from Perry to Hoffman, Perry's administrative assistant and confidant.  In the e-mail, Perry discusses his intent to leave Wallace and Bajjali with nothing. [June 1, 2009 Tr. 118:23–119:9.] The entire "trick" e-mail reads as follows:[13]

> I wanted to let you know that I am going filing bankruptcy per my attorneys advice.  Please do not worry as this is part of my big plan I am going to be hatching this week.  Dave [Wallace] and Costa [Bajjali] think they can pull the wool over my eyes they have no idea what is about to happen and I just love it.  They [Wallace and Bajjali] will walk away with nothing after this week and oh Dave [Wallace] can kiss his political career goodbye.  Costa [Bajjali] will be getting all the blame plus a hell of a lot of debt.  The master is at work and I have them by there balls.  Costa should have never sided with Dave.

[Pls.' Ex. No. 33.] According to Perry, he told Hoffman that he was sending this "trick" e-mail in order to catch Bajjali and Wallace intercepting his e-mails. [June 1, 2009 Tr. 119:15–23; 169:13–19.]

59.     Bajjali did, in fact, have the back up tapes for all the Partnership's e-mails, but did not see the "trick" e-mail until late 2008.  [June 1, 2009 Tr. 118:23–119:23;

---

[13]   The e-mails sent between various persons involved in this adversary proceeding contain misspelled words and grammatical errors.  Rather than insert "[sic]" *ad nauseam*, the Court notes in this footnote that there are numerous grammatical and spelling errors in Perry's e-mails.

169:13–19.] For his part, Wallace never saw Perry's "trick" e-mail prior to October 6, 2006, the date the Separation Agreement was signed. [June 5, 2009 Tr. 75:24–76:4.] The Court finds that Perry's testimony is not credible and that he did not purposely write and send the e-mail to Hoffman in order to "trick" Bajjali by catching him in the act of reading Perry's personal e-mails. Rather, the Court finds that Perry sent this particular e-mail to Hoffman because he was upset and angry and conveying his true thoughts to his close aide.[14]

> b.    *E-mails Involving Bob Perry, the father of Perry*

60.    Bob Perry does not send e-mails himself, but rather has Charlotte Flowers (Flowers), his assistant, receive and send e-mails on his behalf. [June 1, 2009 Tr. 92:10–93:10; June 5, 2009 Tr. 163:15–164:6.] He receives fifty or more e-mails a day, which Flowers places on his desk. He disposes of many e-mails because he does not have time to review them. [June 5, 2009 Tr. 176:23–178:7.]

61.    Perry received many e-mails from Bob Perry and the substance of those e-mails usually centered around Perry's personal life. [June 1, 2009 Tr. 94:3–5.]

> c.    *E-Mails Regarding Wallace's Political Career*

62.    In response to an e-mail sent from Bajjali to Perry, Hoffman, who was Perry's administrative assistant and confidant, sent an e-mail to Perry stating the following:

> They [i.e., Wallace and Bajjali] treat you with no respect and like a child. They sluff you off . . . They will NOT DO AS YOU ASK IN A TIMELY MANNER and it thoroughly pisses me off . . . Will, I am

---

[14] The "trick" e-mail is related to the Purchase Agreement insofar as this e-mail shows Perry's true intent: namely, to execute the Purchase Agreement and then do everything possible to ruin Bajjali's business career and reputation and to destroy Wallace's business career, political aspirations, and reputation.

sorry but this is the most belittling e-mail and I certainly would not stand for anyone to talk to me that way.

[Pls.' Ex. No. 36].

Perry testified that there is no relation between him distributing an online blog that negatively portrays Wallace and then four days later sending the "trick" e-mail to Hoffman stating that:

> I wanted to let you know that I am going filing bankruptcy per my attorneys advice.  Please do not worry as this is part of my big plan I am going to be hatching this week.  Dave [Wallace] and Costa [Bajjali] think they can pull the wool over my eyes they have no idea what is about to happen and I just love it.  They [Wallace and Bajjali] will walk away with nothing after this week and oh Dave [Wallace] can kiss his political career goodbye.  Costa [Bajjali] will be getting all the blame plus a hell of a lot of debt.  The master is at work and I have them by there balls.  Costa should have never sided with Dave.

[June 1, 2009 Tr. 224:7–17; June 2, 2009 Tr. 337:21–25.]; [Pls.' Ex. No. 33.]

63.     In yet another e-mail, which this time Perry sent to Bajjali, Perry wrote the following:

> FYI
>
> I am pretty sure Dave will end up with the Shah's when he leaves here.
>
> But on a possible buy out I will honor my word so you and I maybe work out some sort payment plan between us.
>
> Just thinking about this but this weekend look deep into the recent months of examples of Dave not being in line with us or as a team.  Remember the front sit deal last year with Reagan and you.  Also how about all these deals we ask him if he agrees with Kingwood, Challenger, Baytown to name a few then he backs out at the last minute.  Trust me Dave has been looking to get out of this once my dad was not going to support him politically so weather it is now or six months from now Dave does not want to stay no matter what I say.  It hurts his political future for the company owned by the son/Costa of the largest contributor does not support him really hurts

him.  Why do you think he did not get the write in?  My dad gets
what he wants in politics.

At the end of the day you and I will be much stronger once the storm
is over and yes Dave has helped us build the company into what it is
but don't forget the part you and I have done.  You and I have become
a great team and will continue in the future.  Plus you know the
development business.

Call me this weekend to discuss if you want.

[Pls.' Ex. No. 30.]  Perry testified that he was "[b]eing an arrogant ass" when he

wrote a portion of the aforementioned e-mail.  Bob Perry described the e-mail as

"ugly."  [June 2, 2009 Tr. 312:20–313:21; June 5, 2009 Tr. 168:14–20.]

64.     In another e-mail, which this time Perry sent to Hoffman, who was Perry's

administrative assistant and confidant, Perry wrote that "the ball has started rolling

now I cannot stop it about dave."  Perry asserted that the statement was in reference

to Wallace no longer wanting to be a part of the company.  [June 2, 2009 Tr.

337:21–25]; [Pls.' Ex. No. 47.]  This Court finds this explanation to lack credibility.

Rather, this Court finds that in this e-mail, Perry intended to convey to Hoffman that

he was prosecuting his plan to destroy Wallace's professional and political career.

65.     McGrath received more than one, but no more than five, e-mails from Perry accusing

Wallace of a crime, but could not recall specific details.  [June 3, 2009 Tr.

116:2–117:15.]  On January 1, 2007, Perry sent an e-mail to McGrath and informed

him that Wallace and Bajjali had been involved in serious crimes.  According to

McGrath, Perry informed him that Perry had spoken with both the District Attorney

and Sheriff of Fort Bend County.  [June 2, 2009 Tr. 76:16–25; June 3, 2009 Tr.

119:4–120:8.] Indeed, Perry accused Wallace and Bajjali of trying to extort money, committing gross fraud, and committing serious crimes. [Pls.' Ex. No. 49.]

I.   Wallace's Political Background

66.   Wallace testified that, as far as he knew, his announcement to run for Congressional District seat number 22 did not cause any problems within the Partnership or its businesses. [June 4, 2009 Tr. 174:16–24.] Perry complained to Hoffman, however, about Wallace running his campaign out of the Partnership's office. [June 1, 2009 Tr. 134:6–16.]

67.   Perry asserted that Wallace pressured him—through e-mails—to discuss Wallace's political aspirations with Bob Perry. [June 1, 2009 Tr. 94:23–96:8.] The Court finds that this assertion wholly lacks credibility because at trial, Perry never introduced into evidence any such e-mails from Wallace.  The Court also finds that contrary to Perry's assertion, Wallace did not pressure Perry to discuss Wallace's political aspirations with Bob Perry.

68.   Perry spoke to his father once about whom Bob Perry was going to support in the campaign for Congressional District seat number 22. [June 1, 2009 Tr. 94:23–96:8.]

69.   Both Perry and his father contributed—in a limited capacity—to Wallace's mayoral campaign. [June 5, 2009 Tr. 26:15–16; June 19, 2009 Tr. 49:5–14.] Wallace failed to win the nomination of the Republican Party for this Congressional seat.

70.   Bob Perry's limited funding for Wallace's political campaign did not affect Wallace's business relationship with either Perry or Bajjali. [June 5, 2009 Tr. 28:23–25.]

71.   For the political campaign of Congressional District number 22, Bob Perry supported Shelly Sekula-Gibbs, Mrs. Perry's physician for twenty years. Wallace testified that while he was not upset by Bob Perry's lack of support, he would have appreciated it. [June 5, 2009 Tr. 159:9–18; June 19, 2009 Tr. 41:22–42:13.]

72.   Perry told Kaleta that Wallace's career in politics was over, and that Perry was dissatisfied with the way Wallace and Bajjali were running the Partnership. [June 2, 2009 Tr. 221:20–222:21.]

J.   The Blog

73.   Perry was unaware of who ran the Rhymes with Right blog (the Blog), an online blog that contained highly disparaging information—both politically and personally—about Wallace. [June 3, 2009 Tr. 186:5–12.] Perry did not provide the information concerning Wallace to the Blog and did not have anyone provide it on his behalf. [June 3, 2009 Tr. 191:5–21.] Additionally, Perry did not know whether the information on the Blog was true or false. [June 3, 2009 Tr. 194:19–195:6.]

74.   Perry first saw the Blog in the summer of 2006. [June 3, 2009 Tr. 186:18–188:7.]

75.   Although Perry did not provide the information concerning Wallace to the Blog, Perry circulated the Blog to several people. [June 3, 2009 Tr. 186:15–17.] For example, on September 21, 2006, Perry e-mailed Hoffman, requesting that she print out the Blog and give it to people on his behalf while he remained anonymous. [June 4, 2009 Tr. 38:23–39:19; 40:16–20; 48:1–7]; [Pls.' Ex. No. 37.]

76.   On or around September 9, 2006, Perry's attorneys investigated the information provided in the Blog for evidence of misconduct by Wallace. [June 3, 2009 Tr.

23

223:1–23]; [June 4, 2009 Tr. 23:19–25:22.]  The Blog insinuated, among other things, that Wallace was an arms dealer and was in league with Mark Thatcher in attempting to overthrow the government of Equatorial Guinea.  [June 19, 2009 Tr. 37:11–21]; [Pls.' Ex. No. 21.] The Court finds that the Blog's insinuations regarding Wallace are false.

77.     The allegations contained in the Blog are substantially false.  Wallace testified that in his book, he attributed the Blog to Dean Hrbacek's associates and did not attribute it to either Perry or Bob Perry.[15]  [June 5, 2009 Tr. 17:4–15]; [June 19, 2009 Tr. 16:2–17:2.]  Nevertheless, the Court finds that Perry distributed the Blog.

K.     Harm to Wallace and Bajjali's Respective Careers

78.     Before Perry filed for bankruptcy, he filed a state court fraud lawsuit against Wallace and Bajjali, accusing them of fraud. [June 2, 2009 Tr. 53:5–16.]  The allegations contained in Perry's fraud lawsuit against Wallace did not affect Kaleta's investors in any way.  [June 2, 2009 Tr. 254:20–23.]  Kaleta is still involved and invested in a business run by Wallace and Bajjali.  [June 2, 2009 Tr. 258:1–16.]  Since 2007, Kaleta has placed $15.9 million of his investors' money with Wallace-Bajjali Investment Group (the Wallace-Bajjali Partnership).[16] [June 2, 2009 Tr. 260:12–15.]

---

[15]  Wallace defeated Dean Hrbacek in the 2002 Sugar Land mayoral election.  [June 19, 2009 Tr. 15:3–20.]

[16]  The Wallace-Bajjali Partnership was formed after Wallace and Bajjali left Perry Properties.  Bajjali testified that  he is currently employed by the Wallace-Bajjali Partnership. [June 25, 2009 Tr. 128:16–17.]  The Wallace-Bajjali Partnership has also been referred to as the Wallace-Bajjali Investment Group, but they are the same entity. [June 2, 2009 Tr. 260:12–15; 258:22–25.]

Nevertheless, Kaleta testified that he is now very guarded when conducting business with Wallace and Bajjali. [June 2, 2009 Tr. 261:8–13.]

79.   Frishberg, who is a partner with Wallace and Bajjali in the Laffer Frishberg Wallace Fund,[17] testified that it was formed in approximately June of 2008 and it is a part owner of BizRadio. [June 3, 2009 Tr. 51:19–52:4.]

80.   Perry sent a mass e-mail to various members of the Sugar Land Rotary Club, including Walters, advising them to avoid associating with Wallace and Bajjali. [June 3, 2009 Tr. 98:12–21.]

81.   After McGrath received communications from Perry concerning Wallace, he extracted himself from all involvement with Wallace. [June 3, 2009 Tr. 129:24–131:1.] McGrath participated in multiple business transactions with Wallace prior to January 23, 2007, however, McGrath has not participated in any business transactions with Wallace since January 23, 2007. McGrath has subsequently resigned as trustee of the Wallace Trusts. [June 5, 2009 Tr. 24:22–35:8.]

82.   After McGrath received the e-mail link to the Blog, Wallace came to believe McGrath's trust and confidence in him was gone. [June 5, 2009 Tr. 35:17–22.] Additionally, Wallace believes that his relationship with the Shahs deteriorated after they heard about allegations of Wallace receiving kickbacks and committing crimes. [June 5, 2009 Tr. 39:7–22.]

---

[17]   The Laffer Frishberg Wallace Fund is a private equity investment fund. [June 3, 2009 Tr. 51:19–20.]

83. The Lincoln-Reagan Dinner is an annual fundraiser that the Fort Bend Republican Party puts on to raise money in order to fund campaigns. After Wallace made a contribution to the Lincoln-Reagan Dinner, the contribution was returned to him and he was asked to not introduce the guest speaker. [June 5, 2009 Tr. 47:11–22; 51:16–18.] Additionally, Wallace was asked not to speak at the Gathering of Men, a faith-based men's prayer group attended by approximately fifty to seventy men each month. [June 5, 2009 Tr. 66:25–69:15.] The Court finds that the accusations and allegations that Perry made against Wallace severely harmed his (i.e., Wallace's) political career, and that such harm is evidenced by, among other things, the return to Wallace of his contribution to the Lincoln-Reagan Dinner, the decision by the persons in charge of the Lincoln-Reagan Dinner not to ask Wallace to introduce the guest speaker as he had done in the prior four years, and the decision by the board of the Gathering of Men to withdraw its initial request that Wallace speak to this group. Finally, the accusations and allegations made by Perry against Wallace have had a negative impact not only on his political career, but also on his family life, including his relationship with both his wife and his two daughters. [June 5, 2009 Tr. 78:8–79:25.] Indeed, Wallace noted that all of the accusations that Perry made against him had diminished his ability to be a role model for his two daughters. [June 5, 2009 Tr. 79:23–25.]

L.     Perry's Intent

84.     Perry believes that he is obligated under both the Separation Agreement and the Purchase Agreement. When he entered into these agreements, he intended to honor them. [June 1, 2009 Tr. 176:8–180:21.]

85.     In Perry's Chapter 11 bankruptcy case, it is his intention to honor the Purchase Agreement. If a plan were proposed on his behalf that does not honor the Purchase Agreement, he would want it changed.[18] [June 1, 2009 Tr. 256:3–260:18.] Indeed, Perry affirmatively stated—after repeatedly trying to deflect the questioning of Plaintiffs' counsel—that he will honor the damages stemming from his breach of the nondisparagement clause of the Purchase Agreement (the Nondisparagement Clause). [June 1, 2009 Tr. 274:24–276:15.]

86.     Perry is not aware of any debt that he owes Wallace and Bajjali under the indemnification clause of the Purchase Agreement, i.e., Section 7.1 of the Purchase Agreement (the Indemnification Clause). If Perry was aware of a debt, he asserts that he intends to pay it. [June 1, 2009 Tr. 256:3–257:1.]

87.     Perry never gave any indication to Wallace that he would dishonor the Purchase Agreement. [June 5, 2009 Tr. 76:22–25.]

88.     Perry admits that he breached paragraph 6.3 of the Purchase Agreement. [June 1, 2009 Tr. 271:6–275:2.] Moreover, Perry admits that he received notice that the Flagship

---

[18]  As of the date of this Memorandum Opinion, Perry has not obtained confirmation of any plan. Perry has waited for resolution of this Adversary Proceeding, among others, before seeking to confirm a plan.

Mezzanine loan (the Flagship Loan) was a nonperforming loan. [June 4, 2009 Tr. 103:1–12.]

89. The Imperial Property transaction was a real estate development deal which closed in July, 2007 (the Imperial Sugar Transaction). Perry never paid Bajjali a commission related to the Imperial Sugar Transaction. Bajjali's commission was supposed to amount to approximately thirty percent of the overall commission. Bajjali asked Perry for his commission percentage three times through e-mail. Bajjali received several text messages from Perry stating that Bajjali will not "see a dime." [June 1, 2009 Tr. 182:13–183:16]; [June 25, 2009 Tr. 63:3–23.] During continuous questioning by Plaintiffs' counsel referencing Perry's payment obligations to Bajjali and Wallace, Perry admitted that he had previously stated he was not going to pay Bajjali and Wallace a dime. [June 1, 2009 Tr. 59:8–60:14.]

90. Perry believed Wallace and Bajjali were extorting money from him. [June 1, 2009 Tr. 64:11–15; 66:10–12.] The Court finds that Perry's belief is unreasonable because he introduced no evidence relating to extortion.

91. John Healey (Healey), Fort Bend County's District Attorney, had a conversation with Perry about potentially filing criminal charges against Wallace and Bajjali, but no case was ever brought to Healey. [June 2, 2009 Tr. 154:5–155:20.]

92. Milton Wright (Wright), the Fort Bend County Sheriff, had conversations with Perry regarding certain problems within the Partnership, and on at least one occasion, Perry presented documents for Wright to review. Wright could not determine whether any criminal violations had taken place. [June 2, 2009 Tr. 145:1–5; 146:16–147:7.]

93.   Kaleta, a financial planner and analyst for Frishberg & Kaleta Capital Management (which had made investments in various projects involving Perry Properties), recalled that Perry complained to him that Wallace had committed fraud, and that Perry was threatening to file a fraud lawsuit. [June 2, 2009 Tr. 232:12–16.] Indeed, Perry informed Kaleta that he planned on serving Wallace with a lawsuit while he (i.e., Wallace) was in chambers at Sugar Land City Hall. This plan concerned Kaleta because he had many investors holding him accountable for investments in Perry Properties, and Kaleta did not want allegations of fraud to drag his firm into the dispute. [June 2, 2009 Tr. 216:18–219:8.]

94.   Perry admitted that he filed a fraud lawsuit against Wallace and Bajjali in state court and that his only damages were attorneys' fees. [June 2, 2009 Tr. 298:4–15.]

95.   Perry admitted he had no evidence to substantiate his claim that Wallace and Bajjali were receiving kickbacks. [June 2, 2009 Tr. 296:12–18.] The Court finds that contrary to Perry's assertions, Wallace and Bajjali never took any kickbacks.

96.   Perry told Frishberg that he was not interested in reconciling with Wallace and Bajjali. [June 3, 2009 Tr. 49:22–50:8.]

97.   Thode testified that Perry told him that he (i.e., Perry) was going to ruin Wallace's political career. [June 3, 2009 Tr. 139:20–140:7.]

M.   Damages

98.   Because of Perry's actions in relation to the Fund, Bajjali incurred damages. [June 25, 2009 Tr. 128:11–15.] These damages included the costs of restructuring the loans

29

relating to the Fund's projects.[19]  [June 25, 2009 Tr. 230:16–20.]  Wallace and Bajjali met with every single lender in order to avoid foreclosure on all of the properties. [June 25, 2009 Tr. 230:16–232:3.]

99.     The Imperial Sugar Transaction closed in July 2007, but Bajjali has not been paid his commission, even though he has repeatedly asked Perry for the money.  [June 1, 2009 Tr. 182:13–183:16.]

100.    The Wallace-Bajjali Partnership assumed the debts of the Fund approximately sixteen to eighteen months after the execution of the Purchase Agreement.  [June 25, 2009 Tr. 128:16–129:19.]  The Wallace-Bajjali Partnership then restructured the Fund debt using cash borrowed from investors.  The total amount used to restructure the Fund debt was approximately $3.78 million.  [June 25, 2009 Tr. 231:2–232:3.]  Each creditor of the Fund filed a proof of claim in Perry's bankruptcy case.  After the Wallace-Bajjali Partnership restructured the debts owed by the Fund—mitigating damages—the creditors withdrew their proofs of claim.[20]   [June 25, 2009 Tr. 240:6–249:10.]  Meanwhile, Bajjali himself filed a proof of claim, which he later amended, against Perry's bankruptcy estate for the amount of $15,644,767.54.

---

[19]  Because Wallace himself was never partner in Perry Properties, Perry had no obligation under the Purchase Agreement to indemnify Wallace; rather, Perry's obligation was to indemnify Bajjali and the Wallace Trusts.  [Pls.' Ex. No. 4] Accordingly, Perry's failure to indemnify, among other actions, results in damages to Bajjali, but not to Wallace personally.

[20]  The following Fund debts were restructured by the Wallace-Bajjali Partnership: the Flagship Loan and the Amegy Bank loan (the Amegy Loan) (collectively, the Meadow Crest Loans), the Bank of Texas Riata West loan and Lakecrest loan (collectively, the Bank of Texas Loans), the Wachovia Bank Morton Crossing and Morton Ranch loans (collectively, the Morton Loans), the Frost Bank Creekmont loan (the Creekmont Loan), and the Amegy Bank Cypress Trails loans (the Cypress Loans).

According to the amended proof of claim, this figure is calculated from, among other things, Perry's obligation to indemnify Bajjali for all liabilities arising from the personal guarantees executed by Bajjali in connection with the Partnership's operations. [Pls.' Ex. No. 56.] Under these circumstances, the Court finds that Bajjali incurred damages because Perry failed to honor the Indemnification Clause.

101.  Wallace testified, and the Court finds, that the liquidated damages provision of the Purchase Agreement (i.e., Section 6.2) (the Liquidated Damages Clause) does not apply to loans or guarantees associated with the Fund; rather, the Liquidated Damages Clause only applies to the personal guarantees entered into by Bajjali or the Wallace Trusts that are in relation to borrowings made by the Partnership. [June 23, 2009 Tr. 61:16–62:1; 65:6–11]; [Pls.' Ex. No. 4, § 6.2.]

102.  Bajjali, and the Wallace Trusts were personal guarantors of the Flagship Loan. [June 25, 2009 Tr. 112:1–4; 122:8–25; 37:20–22.] The Wallace-Bajjali Partnership paid off the Flagship Loan in full, paying $1.0 million [June 25, 2009 Tr. 240:17–241:3]; [Pls.' Ex. No. 16.][21] The Wallace-Bajjali Partnership paid $173,704.00 to avoid an indemnity claim for the Amegy Loan. [June 25, 2009 Tr. 241:14–242:4]; [Pls.' Ex. No. 16.]

103.  Bajjali was a personal guarantor of the Morton Loans. [June 25, 2009 Tr. 112:13–16; 38:21–23.] The Wallace Trusts were not personal guarantors of the Morton Loans. [June 25, 2009 Tr. 123:8–15.] The Wallace-Bajjali Partnership paid down the balance

---

[21]  The Meadow Crest Loans were paid by Meadow Crest Developers 226 Partnership (the Meadow Crest Partnership). [Def.'s Ex. Nos. 43, 44, 45 & 47.] The money that the Meadow Crest Partnership used, however, effectively came from the Wallace-Bajjali Partnership. [June 25, 2009 Tr. 196:19—197:12.]

of the Morton Loans by $76,915.00.     [June 25, 2009 Tr. 199:24; 200:20; 245:15–246:7; 246:18–247:25.]

104.    Bajjali and Wallace were personal guarantors of the Creekmont Loan. Perry was also a personal guarantor on the Creekmont Loan. The Wallace-Bajjali Partnership paid down the balance of the Creekmont Loan by $911,956.00. [June 25, 2009 Tr. 248:21–249:9]; [Pls.' Ex. No. 16.]

105.    Bajjali and the Wallace Trusts were personal guarantors for the Bank of Texas Loans. [June 25, 2009 Tr. 116:3–20; 125:5–22.] Wallace was not a personal guarantor for the Bank of Texas Loans.   [June 25, 2009 Tr. 116:3–20.] The Wallace-Bajjali Partnership paid down the balance of the Bank of Texas Loans by $417,773.00. [June 25, 2009 Tr. 242:5–244:5]; [Pls' Ex. No. 16.]

106.    Bajjali personally guaranteed the Cypress Loans. [Pls. Ex. No. 56.] The Wallace-Bajjali Partnership restructured the Cypress Loans by paying $1,199,967.00 to Amegy Bank, in part covering cost overruns. [June 25, 2009 Tr. 231:19–232:3; 201:1–14.] The total amount spent on restructuring the loans was $3,780,315.00. [June 25, 2009 Tr. 198:5–16]; [Pls.' Ex. No. 16.] Sections 7.1–7.3 of the Purchase Agreement—i.e., the Indemnification Clause—apply to any personal guarantees entered into by Bajjali and the Wallace Trusts that are made in relation to the operations of the Partnership and its affiliates, including the Fund. In contrast, the Liquidated Damages Clause does not include borrowings made by the Fund. [June 23, 2009 Tr. 65:16–25; 69:5–21]; [Pls.' Ex. No. 4 §§ 7.1–7.3.] The Liquidated Damages Clause states that Perry would owe liquidated damages in the event he failed to use his reasonable and best efforts

to release Bajjali and the Wallace Trusts from all liability for any borrowings made

by the Partnership by December 31, 2006.  [Pls.' Ex. No. 4 § 6.2.]

107.   The Plaintiffs' complaint fails to specifically plead lost profit damages.

## IV. CREDIBILITY OF WITNESSES

A.   <u>Will Clay Perry (the Debtor and Defendant)</u>

The Court gives little weight to the testimony of Perry.  Perry attempted to convince the Court

that he was credible and honest at the beginning of his testimony.  [June 1, 2009 Tr. 51:12–53:4.]

After this initial attempt to appear credible, however, Perry frequently had difficulty telling the truth,

the whole truth, and nothing but the truth.  [June 2, 2009 Tr. 62:15–25.]  Perry's lack of credibility

was obvious throughout his testimony.  He often answered "I don't know" and "I don't remember"

when asked questions by opposing counsel.  [June 1, 2009 Tr. 54:16–22]; [June 1, 2009 Tr.

40:9–42:3.]   Moreover, his testimony changed as need dictated.   His answers were highly

contradictory throughout the course of questioning.  Perry's lack of credibility spanned almost every

topic that counsel raised.

### 1.   *Financial Responsibilities*

Perry's inability to take financial responsibility for himself and his business matters became

evident throughout his testimony.  He continuously refused to recognize his own financial problems.

Additionally, when questioned on this topic, he was extremely reluctant to admit that his father had

helped him financially.  Indeed, his answers consistently varied on the subject.  Perry admitted that

his father paid the majority of his bills.  When further questioned, however, Perry asserted that he paid

his own bills.  Perry was also unwilling to acknowledge his current woeful financial situation.  [June

1, 2009 Tr. 41:21–42:3]; [June 4, 2009 Tr. 50:22–53:23.]

Further underscoring Perry's lack of credibility, he unequivocally testified that Perry Properties could pay its employees' salaries prior to Wallace joining the organization. [June 1, 2009 Tr. 72:12–23.] However, in an e-mail from Bajjali to Perry, Bajjali had stated the exact opposite: "Remember when we could not pay the bills or cover payroll for the employees. I had to take a second loan on my house to cover my monthly expenses as we could not make partners payroll regularly." [Pls.' Ex. No. 25.] Because this Court finds that Bajjali is a much more credible witness than Perry, Perry's testimony that Perry Properties could pay the salaries of its employees prior to Wallace joining the entity is not credible.

Perry also refused to answer opposing counsel's questions in a straightforward manner. His answers changed several times as to whether or not he paid Wallace and Bajjali under the Purchase Agreement. Indeed, it finally came to light during Perry's testimony that he paid Wallace and Bajjali using money from a third-party loan that he has yet to pay back. [June 4, 2009 Tr. 138:25–139:22.] This constant change in testimony underscores Perry's lack of credibility.

2.    *Wallace's Political Campaign*

Perry testified that Wallace e-mailed him and pressured him to enlist Bob Perry's support for Wallace's Congressional campaign. Supposedly, these e-mails were part of the ultimate dissolution of the Partnership. Perry introduced none of these alleged e-mails into evidence, however, to support this allegation. [June 1, 2009 Tr. 76:7–78:17.]

Perry's contention that Wallace e-mailed Perry and asked Perry to persuade Bob Perry to support Wallace's election lacks credibility. In an adversarial proceeding, where both Plaintiffs' and Defendant's counsel entered an abundance of e-mails into evidence, Perry's inability to introduce one e-mail into evidence to support his assertions poses serious questions as to his ability to tell the truth.

34

The Court finds Perry to be wholly lacking in credibility on this issue and finds that Wallace never pressured Perry to enlist Bob Perry's support for Wallace's congressional campaign.

### 3. The Purchase Agreement

Opposing counsel examined Perry about two major topics relating to the Purchase Agreement: the "trick" e-mail and the commission agreement between Bajjali and Perry.[22] Throughout all of Perry's testimony regarding these two topics, Perry's statements were inconsistent with his own previous testimony and both Plaintiffs' and Defendant's exhibits admitted into evidence.

### 4. The "Trick" E-mail

Perry seriously damaged his credibility when Plaintiffs' counsel questioned him about the "trick" e-mail. Perry wrote what he refers to as the "trick" e-mail on September 25, 2006 and sent it to Hoffman, his administrative assistant and confidant. [Finding of Fact No. 58.] He did so because he thought Bajjali was reading all of his (i.e., Perry's) e-mails. Perry contends that the purpose of the e-mail was to generate a reaction out of Bajjali and prove that Bajjali was reading Perry's e-mails. As this Court has already found, this Court does not find this contention at all credible.[23]

Perry failed to answer questions directly relating to the "trick" e-mail. He consistently answered "I don't know," and he was reluctant to give straightforward answers to any questions posed by counsel. [June 1, 2009 Tr. 156:1; 158:14; 160:13–16.] Further, he initially testified that he had

---

[22] The "trick" e-mail is reviewed in detail at Finding of Fact Nos. 58–59. The "trick" e-mail is related to the Purchase Agreement insofar as this e-mail shows Perry's true intent: namely, to execute the Purchase Agreement and then do everything possible to ruin Bajjali's business career and reputation and to destroy Wallace's business career, political aspirations, and reputation.

[23] See Finding of Fact Nos. 58–59

given little thought to the e-mail when he drafted it. [June 1, 2009 Tr. 213:23–214:7.] Later, Perry

stated that he thought about the "trick" e-mail for several hours. [June 1, 2009 Tr. 214:4–17.]

      5.    *Commission Agreement Between Bajjali and Perry*

As part of the Purchase Agreement, Perry promised to pay Bajjali a commission from the

Imperial Sugar Transaction. [Def.'s Ex. No. 10.] Perry contradicted himself and showed a total lack

of credibility throughout his testimony on this subject. Initially, Perry stated that he intended to pay

Bajjali. Subsequently, he testified that he had the money but never paid Bajjali. Finally, Perry

admitted he owed Arora—an investor in the Fund—money for the same commission that he owed

Bajjali. [June 1, 2009 Tr. 184:2–13; 192:2–17.]

      6.    *Specific Breaches of the Nondisparagement Clause of the Purchase Agreement*

Perry testified about specific instances in which he breached the Nondisparagement Clause.

When Plaintiffs' counsel questioned Perry regarding the Nondisparagement Clause, Perry had

difficulty being consistent with his previous testimony. He consistently changed his testimony when

a question was repeated to him by counsel. Thus, Perry lacked all credibility when questioned

regarding breaches of the Nondisparagement Clause of the Purchase Agreement.

      7.    *The Blog*

        *a.*    *Post Date of the Blog*

Perry changed his testimony three times as to when he first saw the information posted on the

Blog, an online blog that contained disparaging information—both politically and personally—about

Wallace. Perry testified that he first saw the information posted on the Blog sometime in December

of 2006. Subsequently, he testified that he first saw the information posted on the Blog in June or

July of 2006. The first entry on the Blog, however, is dated August 15, 2006. When first questioned, Perry had no explanation as to how he saw the information prior to the post date. Subsequently, he claimed to have seen the information on a different website, which he could neither name nor provide evidence of its existence. [June 3, 2009 Tr. 186:18–187:19; 188:5–25; 192:4–9]; [June 4, 2009 Tr. 29:12–30:1.] Given Perry's conflicting testimony, the Court finds that he is not credible with respect to this topic.

### b.    *Perry's Investigation of the Information on the Blog*

Perry consistently contradicted himself when testifying about the Blog. Perry initially testified that he never received independent confirmation as to the truth of the allegations on the Blog. Later, Perry contradicted himself by stating that he independently researched some of the allegations. In particular, he stated that he read an article from The Guardian,[24] a newspaper that was hyperlinked in the Blog. He later contradicted himself by testifying that he did not read The Guardian article; instead, he claimed that he sent the information to his lawyers for them to investigate. Overall, his answers relating to when he conducted his investigation were both contradictory and, therefore, lacking in credibility. [June 3, 2009 Tr. 194:22–195:8; 204:15–205:6; 206:9–12; 208:16–209:17; 220:3–221:7.]

### c.    *Anonymous Disbursement of the Blog*

Perry distributed the Blog to many people. Specifically, Perry e-mailed the link to the Blog to his secretary, requesting that she anonymously distribute it to two people. When questioned, Perry changed his testimony several times and gave several explanations as to why he wanted his secretary

---

[24]   The Guardian is a British daily newspaper based in London, England.

to distribute the Blog anonymously. Most of Perry's answers were contradictory and were devoid of any credibility. [June 4, 2009 Tr. 40:12–25; 44:24–46:15.]

8.   *Accusations against Wallace and Bajjali*

When questioned about e-mails that Perry sent stating that Wallace and Bajjali were unethical and corrupt, Perry did not want to admit that he sent these e-mails. He stated that he did not "recall an exact instance, but [he] wouldn't necessarily deny it." Perry's unwillingness to answer questions in a straightforward manner further underscores his lack of credibility. [June 4, 2009 Tr. 37:19–38:9.]

a.   *E-mail to McGrath from Perry*

Perry testified that he sent an e-mail to McGrath accusing Wallace and Bajjali of criminal acts. Perry stated he sent the e-mail prior to receiving confirmation from the District Attorney and the Sheriff regarding the truth of Perry's accusation. In contrast, Perry stated in a previous deposition that he had heard from both the District Attorney and the Sheriff before he sent the e-mail to McGrath. Perry was unwilling to acknowledge the contradictory statements from his deposition. [June 2, 2009 Tr. 41:17–44:23; 53:5–59:1.]

b.   *E-mail to the Shahs from Perry*

Perry testified that he sent an e-mail to the Shahs alleging that Wallace and Bajjali had received kickbacks. [Finding of Fact No. 47.] He later testified, however, that this e-mail was a lie. Subsequently, Perry stated that the e-mail was the truth, but he had no evidence to support his assertion. Again, Perry had difficulty distinguishing between truth and falsehood, and was unable to keep track of his prior statements. Perry altered his answers based on whether the answer was helpful to his case at that particular juncture in the trial. [June 2, 2009 Tr. 62:15–25; 63:13–18; 74:1–22.]

B.   Sylvia Hoffman

The Court gives little weight to Hoffman's testimony. Hoffman—Perry's assistant—attempted to appear credible throughout her testimony; however, she frequently responded with "I don't remember" when questioned regarding her relationship with Perry and interoffice interactions between partners and employees. Hoffman explained that Perry was her "bread and butter," and she consistently evaded questions when the answer might reflect poorly on Perry. While working for Perry, Hoffman received a large salary, and Perry paid many of her personal expenses. The day after leaving Perry Properties, Hoffman obtained a job at Wauson & Probus—the law firm representing Perry—due to Perry's influence. While Hoffman claimed that she does not like Perry, she still refused to bite the hand that fed her. [June 1, 2009 Tr. 101:16–22; 120:25–122:3; 135:10–136:18; 139:7–13; 140:13–21; 141:16–19.]

Hoffman was defensive when questioned regarding a number of topics. In particular, Hoffman was reluctant to admit that she read all of Perry's e-mails prior to printing and filing them. Though she attempted to appear credible, her priority was protecting her former employer, Perry. Overall, Hoffman's testimony lacked credibility and the Court gives little weight to her testimony.

C.   Fred Zeidman

The Court finds Zeidman's June 2, 2009 testimony to be credible. Zeidman, a former member of the Fund advisory board, answered questions in a forthright manner and to the best of his ability. He honestly admitted when he could not remember specific details of conversations and occurrences. He was not biased and he was not argumentative with counsel.   [June 2, 2009 Tr. 83:5–88:12.] Therefore, the Court gives Zeidman's testimony substantial weight.

39

D.   Taseer Badar

Although Badar has a close relationship with Wallace, Badar—an investment banker with heavy investments in Perry Properties—honestly testified that his only conversations with Perry were superficial. [June 2, 2009 Tr. 88:24–105:11.] This Court finds Badar credible in his testimony and gives his testimony substantial weight.

E.   Reagan Tielke

Tielke originates residential mortgages for a mortgage company, though Tielke required clarification as to what he does for a living. Tielke's testimony reflected significant bias in favor of Perry. He was unable to remember facts and occurrences that he deemed to be unfavorable to Perry's defense. [June 2, 2009 Tr. 114:18–25.] This Court gives little weight to Tielke's testimony due to both his bias and his unwillingness to be forthright.

F.   Kraig Killough

Kraig Killough, a financial advisor and partner to Badar, was a credible witness. Although he continues to do business with Wallace, his answers reflected no bias. The Court gives substantial weight to his testimony.

G.   James Prestage

Prestage—a Fort Bend County Commissioner—was honest in his testimony and admitted that he gave little credence to Perry's political threats. In one specific instance, Perry made profane remarks toward Prestage because Prestage advised a company not to purchase a piece of property from Perry. [June 2, 2009 Tr. 132:15–133:16.] Despite this potential cause for bias, the Court found Prestage to be honest. He answered questions directly and in a forthright manner. Therefore, the Court finds Prestage's testimony credible and gives it substantial weight.