H.    Jim Beamon

Beamon was honest and straightforward in his testimony. The Court finds that Beamon is a credible witness and gives his testimony substantial weight.

I.    Milton Wright

Wright, the Fort Bend County Sheriff, was honest and straightforward in his testimony and this Court gives significant weight to his testimony.

J.    Roger Arora

Although Perry owes Arora—an investor in the Fund—a significant amount of money, Arora did not allow this potential bias to taint his testimony. The Court finds Arora's testimony credible and honest, and gives his testimony substantial weight.

K.    Trish Glover

Glover, a former employee of Perry Properties, was reluctant to testify, and she was fairly nervous on the stand. Yet, she was honest in answering the questions presented to her. The Court finds Glover a credible witness.

L.    John Healey

Healey, Fort Bend County's District Attorney, was honest and forthright in his answers. The Court finds Healey's testimony credible and gives it substantial weight.

M.    Marshall Whichard

Marshall Whichard (Whichard) is a private investigator in Fort Bend County. He has performed investigations for Perry on numerous occasions. Whichard was a credible witness and the Court gives significant weight to his testimony.

41

N.    Richard Tisch

There were contradictions in Richard Tisch's (Tisch) testimony regarding whether Tisch knew that Perry, Wallace, and Bajjali were partners and whether he knew that the Partnership had dissolved. [June 2, 2009 Tr. 188:15–189:12; 189:25–190:14; 191:4–7.]

Tisch, a friend of Perry, was protective of Perry while maintaining a semblance of loyalty to Wallace and Bajjali.  He refused to expand and explain comments Perry had made to him regarding Wallace and Bajjali.  While Tisch appeared honest in his testimony, he was very tight lipped and unwilling to freely disclose information.  The Court does not give significant weight to his testimony.

O.    Reggie Jacob

Reggie Jacob (Jacob), a commercial real estate broker and a former employee of Perry Properties, was honest in his answers, though unable to remember specific details and to expand on conversations to which he was a party.  The Court finds Jacob a credible witness, but cannot give significant weight to his testimony because his recollection was poor.

P.    Albert Kaleta

Kaleta, a financial planner and analyst for Frishberg & Kaleta Capital Management, was forthright and honest, even though he was disenchanted with Perry's failures as a businessman and the negative effect these failures have had on the clients whom Kaleta had persuaded to invest in Perry Properties.  Overall, the Court finds Kaleta to be credible and gives substantial weight to his testimony.

Q.    John Lunsford

Lunsford, an investor involved in radio media, answered questions directly and honestly.  He knows Perry, Wallace, and Bajali, and did not show any bias toward any of them.  The Court finds Lunsford to be credible and gives his testimony significant weight.

R.    Daniel Frishberg

While Frishberg—a former business associate of Perry and an investor—appeared credible and honest, the Court does not give Frishberg's testimony significant weight.  Frishberg attempted to answer questions truthfully, but his answers were colored by his bias.  Frishberg was very angry at Wallace, Bajjali, and Perry for the failure of the Partnership, and this bias was reflected in many of his responses.  [June 3, 2009 Tr. 38:16–25; 40:9–41:11; 43:11–25; 83:15–22.]  Given these circumstances, the Court gives some, but not significant, weight to his testimony.

S.    Robert Walters

The Court finds Walters, a member of the Sugar Land Rotary Club, to be credible and honest in every way.  He was very straightforward in his responses and made every effort to tell the truth.  The Court gives significant weight to Walters' testimony.

T.    Meredith Iler

The Court finds Iler—a member of both the Houston Rotary Club and an organizer of the Coalition to Salute America's Heroes—to be credible.  Iler is somewhat biased, however, because Perry Homes is a major financial contributor to the Coalition to Salute America's Heroes. The Court gives some weight to her testimony.

U.    Michael McGrath

McGrath—owner of Asset Plus Corporation and a former member of the investment committee for Perry Properties—was extremely honest and direct when answering questions posed by counsel. While he could have been biased due to his personal connection with Wallace and Wallace's family, he did not show any bias whatsoever and made every attempt to answer all questions honestly and to the best of his ability. The Court finds McGrath credible and gives his testimony significant weight.

V.    Eric Thode

Thode, a former Republican Party Chairman of Fort Bend County, knows both Perry and Wallace, but he did not appear biased toward either party. The Court gives substantial weight to Thode's testimony and finds him credible.

W.    Bert Keller

Keller testified regarding an e-mail that Perry sent him. In the e-mail, Perry told Keller that Keller was "not a good person." [June 3, 2009 Tr. 155:15–156:11.] Although Perry attacked Keller's character and raised the possibility of bias in Keller's testimony, Keller remained neutral during the testimony. He answered questions truthfully and directly. The Court finds Keller's testimony to be credible and gives his testimony significant weight.

X.    Bob Perry

Bob Perry, Perry's father, answered questions honestly and directly throughout his testimony. [June 5, 2009 Tr. 158:24–25.] When there were slight inconsistencies with a portion of his testimony, Bob Perry attempted to clarify the differences and explain them forthrightly. [June 5, 2009 Tr. 136:8–137:24; 160:20–161:5.] Not surprisingly, because Bob Perry is the father of Perry and no

44

doubt loves his son, Bob Perry was hesitant to speak negatively of his son. Indeed, he quite justifiably tried to avoid admitting that his son could have lied. [June 5, 2009 Tr. 164:19–165:5; 168:8–169:11; 180:21–25; 182:13–25.] The Court does not view Bob Perry any less credible for this attitude. Any loving father would take the same approach. Overall, Bob Perry's testimony is very credible, and the Court gives significant weight to his testimony.

Y.     David Wallace

While Wallace was slightly guarded in some of his answers as the trial progressed, he did not evade questions posed to him; rather, he responded clearly. Indeed, even when he knew that answers to certain questions posed to him were not favorable to his position, Wallace answered honestly. This Court gives significant weight to Wallace's testimony and considers him to be a credible witness.

Z.     Costa Bajjali

Bajjali was very honest and credible throughout his testimony. He made every attempt to be direct and truthful when answering questions posed by counsel. While Bajjali had reason to be biased against Perry, he demonstrated through his testimony that he was not vindictive. The Court finds Bajjali to be very credible and gives significant weight to his testimony.

**V. CONCLUSIONS OF LAW**

A.     Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (I), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the

context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)* Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Venue is proper pursuant to 28 U.S.C. § 1409.

B.    Claims Brought by Plaintiffs Pursuant to 11 U.S.C. § 523(a)(6)

1.    *Breach of Contract Claims*

A bankruptcy court must use applicable state law to decide the outcome of a breach of contract claim brought against the bankruptcy estate. *See IRS v. Luongo (In re Luongo)*, 259 F.3d 323, 331 (5th Cir. 2001); *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1119 (5th Cir. 1995). Here, Texas state law applies, as the parties entered into the Purchase Agreement in Texas.[25] *Indus. Insulation Group, LLC v. Sproule*, 613 F. Supp. 2d 844, 852 (S.D. Tex. 2009) (holding that Pennsylvania law, rather than Texas law, should govern because, among other reasons, that is where the agreements were consummated).

a.    *Standing for Breach of Contract Claims*

In Texas, to have standing to seek redress for a breach of contract, a plaintiff "must be personally aggrieved; his alleged injuries must be concrete and particularized, actual or imminent, not hypothetical. A plaintiff does not lack standing simply because he cannot prevail on the merits of his claim; he lacks standing because his claim of injury is too slight for a court to afford redress."

---

[25] Additionally, Section 9.5 of the Purchase Agreement (which is entitled "Governing Law and Venue") reflects the parties' intention to be bound by Texas law. [Pls.' Ex. No. 4, § 9.5.] "Under Texas law, where the parties to a contract dispute have agreed to an enforceable choice of law clause, the court must apply the law of the state upon which they agreed." *Int'l Interests, L.P. v. Hardy*, No. Civ.A. H-03-2418, 2004 WL 3998092, at *3 (S.D. Tex. Nov. 17, 2004) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).

46

*DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008) (footnotes omitted). A court

must determine standing when the suit is filed in the trial court. *In re Vogel*, 261 S.W.3d 917, 921

(Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852

S.W.2d 440, 446 n.9 (Tex. 1993). "Only the person whose primary legal right has been breached may

seek redress for an injury." *Exxon Corp. v. Tyra*, 127 S.W.3d 12, 14 (Tex. App.—Tyler 2003, pet.

denied) (quoting *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976)). If a legal right has not been

breached, the plaintiff does not have standing. *Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728, 732

(Tex. App.—Texarkana 2003, no. pet.). "Privity of contract provides a party with standing to

maintain a suit on the contract." *Campbell v. Auto. Ins. Co. of Hartford Conn.*, No. 07-06-0158-CV,

2007 WL 1390625, at *2 (Tex. App.—Amarillo, May 9, 2007, no pet.) (citing *Interstate Contracting*

*Corp. v. City of Dallas*, 135 S.W.3d 605, 618 (Tex. 2004)).

### i.      Standing to Sue

Bajjali is a signatory to the Purchase Agreement. The Purchase Agreement defines Bajjali,

as well as the Wallace Trusts, as "Sellers." [Finding of Fact No. 4.] Bajjali has asserted injuries from

Perry's breach of the Purchase Agreement. [Adv. Docket No. 1, ¶¶ 31–32.]   Because Bajjali is

named in the contract as a "Seller" and because Perry signed the contract, both Bajjali and Perry are

in privity of contract. Thus, Bajjali has standing to sue Perry.

### ii.      The Wallace Trusts Lack Standing to Sue

The Wallace Trusts are parties to the Purchase Agreement.[26] The Purchase Agreement defines

the Wallace Trusts as "Sellers." [Finding of Fact No. 4.] Bajjali and the Wallace Trusts assert

injuries from Perry's breach of the Purchase Agreement. [Adv. Docket No. 1, ¶¶ 31–32.]   Because

---

[26]  McGrath, as the trustee of the Wallace Trusts, signed the Purchase Agreement. [Pls.' Ex. No. 4.]

the Wallace Trusts are named in the contract as "Sellers," and because Perry signed the contract, they are in privity of contract.

Despite the fact that Perry and the Wallace Trusts are in privity of contract, the Wallace Trusts lack standing to sue. Administration of trusts in Texas is governed by the Texas Property Code. The Texas Property Code states that "[a]ny interested person may bring an action." TEX. PROP. CODE ANN. § 115.001(a). An interested person is defined as "a trustee, beneficiary, or any other person having an interest in or a claim against the trust or any person who is affected by the administration of the trust. Whether a person, excluding a trustee or named beneficiary, is an interested person may vary from time to time and must be determined according to the particular purposes of and matter involved in any proceeding" TEX. PROP. CODE ANN. § 111.004(7).[27]

The Texas Supreme Court has held that a trust itself may not sue or be sued directly. *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 571 (Tex. 2006). Indeed, a trust is not a legal entity, and "[c]ivil suits may be maintained only by or against parties having an actual or legal existence." *Bailey v. Vanscot Concrete Co.*, 894 S.W.2d 757, 759 (Tex. 1995); *Ray Malooly Trust*, 186 S.W.3d at 571. Moreover, a "trustee has the sole right and responsibility to enforce a cause of action in favor of a trust," which is only abrogated to a beneficiary when the trustee cannot or will not enforce the cause of action. *Hamilton v. McLean*, No. 03-99-00320-CV, 2000 WL 502828, at * 3 (Tex. App.—Austin, April 27, 2000, no pet.). Here, neither the trustee of the Wallace Trusts nor a beneficiary of the Wallace Trusts sued on behalf of the Wallace Trusts. Instead, the Wallace Trusts, in their respective capacities as trusts, sued Perry. Based upon the authorities cited above, the Wallace Trusts do not

---

[27] A "business trust" is included within the definition of person. TEX. PROP. CODE ANN. § 111.004(10). For the purposes of this suit, however, it does not matter what type of trust the Wallace Trusts are, as the applicable law in Texas is that no trust, regardless of its nature, may sue or be sued directly.

have standing to sue for breach of the Purchase Agreement.  Only the trustee of the Wallace Trusts has standing to bring such suit.  Accordingly, the Wallace Trusts are barred from recovering any relief which they seek.

However, in case this Court is incorrect in its conclusion that the Wallace Trusts lack standing to sue, the Court will discuss the Wallace Trusts' causes of action *infra*.  In so doing, the Court reaches the conclusion that the Wallace Trusts should not recover any of the relief which they seek.

iii.     *Wallace Lacks Standing to Sue Under the Indemnification Clause*

As noted above, under Texas law, a person must be in privity of contract in order to recover in any contract action. *Interstate Contracting*, 135 S.W.3d at 618 (citing *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001); *Republic Nat'l Bank of Dallas v. Nat'l Bankers Life Ins. Co.*, 427 S.W.2d 76, 69 (Tex. Civ. App.—Dallas 1968, writ ref'd n.r.e.)).  An exception to the general rule requiring privity of contract, however, is the third-party beneficiary exception.  *Republic Nat'l Bank*, 427 S.W.2d at 79 (citing 13 Tex. Jur. 2d, Contracts, § 352, pp. 628–29; 17A C.J.S. Contracts § 519(1), p. 947, et seq.).  To qualify as a third party beneficiary under Texas law: (1) Wallace must not have been in privity of contract; (2) the contract (here, the Purchase Agreement) must have been made—at least in part—for Wallace's benefit; and (3) the contracting parties must have intended in the written agreement to benefit Wallace.  *IP Petroleoum Co. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 898–99 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *Hellenic Inv., Inc. v. Kroger Co.*, 766 S.W.2d 861, 864 (Tex. App.—Houston [1st Dist.] 1989, no writ).

Wallace does not have standing to sue under the Indemnification Clause.  At trial, Defendant's counsel adduced testimony from Wallace that he was neither listed as a "Seller" on the Purchase

Agreement nor had a personal guaranty from Perry at the time he filed his proof of claim. [Finding of Fact No. 4] Wallace was not a party to the Purchase Agreement, nor did he sign as trustee of the Wallace Trusts. [Pls.' Ex. No. 4, pp. 8–10.] Therefore, Wallace was not in privity of contract under the Purchase Agreement's indemnification provision. The first element for Wallace qualifying as a third-party beneficiary is satisfied.

Wallace also satisfies the second element because he stands to benefit from the agreement by being indemnified. [Def.'s Ex. Nos. 39, 50 & 52.] Wallace personally guaranteed a number of loans for which the Wallace-Bajjali Partnership was forced to expend funds in order to restructure the personally guaranteed loans. [Finding of Fact Nos. 98–106.] As such, if Wallace was a party to the Indemnification Clause, Perry would have to indemnify Wallace and compensate him for funds expended in restructuring the loans.

Wallace, however, fails to satisfy the third requirement. No evidence was produced indicating that the contracting parties intended for Wallace to benefit from the indemnification provision. Texas law states that "when parties have executed a written contract, then the search for the parties' intent regarding a third-party beneficiary is limited to the four corners of the written instrument." *Talman Home Fed. Sav. & Loan Ass'n of Ill. v. Am. Bankers Ins.*, 924 F.2d 1347, 1352 (5th Cir. 1991) (quoting *Cunningham v. Healthco, Inc.* 824 F.2d 1448, 1458 (5th Cir. 1987)) (internal quotation marks omitted). Moreover, "The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied." *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1998). The language within the four corners of the Purchase Agreement does not indicate an intent to indemnify Wallace. While Bajjali and the Wallace Trusts are specifically referred to as "Sellers," Wallace individually is not mentioned.

[Pls.' Ex. No. 4.] The Purchase Agreement only mentions Wallace individually in section 6.5, which notes that the car provided to Wallace "may be used by the Sellers after closing." [Pls.' Ex. No. 4, § 6.5.]

Even looking outside the language of the Purchase Agreement, evidence suggests that the parties did not intend for Wallace to be included as a third-party beneficiary. When examined, Wallace answered, "That's correct" to the question "[y]ou personally and individually were not a party to the Purchase Agreement; correct?" [June 23, 2009 Tr. 51:4–6.] Therefore, Wallace's own testimony indicates that he did not contemplate that he was a party to the Purchase Agreement or that he ever contemplated benefiting from it. For these reasons, Wallace has no standing to sue under the Indemnification Clause.

iv.    *Wallace Lacks Standing to Sue Under the Nondisparagement Clause*

The Purchase Agreement contemplates extension of the Nondisparagement Clause to affiliates of the Sellers, [Pls.' Ex. No. 4, § 7.1], and there is no question that the Wallace Trusts are indicated as Sellers in the Purchase Agreement. [Finding of Fact No. 2]; [Pls.' Ex. No. 4, p. 1, ¶ 5.] Wallace has no standing to sue under the Nondisparagement Clause of the Purchase Agreement, however, because he is not an affiliate of the Wallace Trusts.

An affiliate, as defined by Texas trust law, is "(A) a person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with another person; or (B) any officer, director, partner, employee, or relative of a person, and any corporation or partnership of which a person is an officer, director, or partner." TEX. PROP. CODE ANN. § 111.004(1).

51

The Texas Property Code defines "Person" as:

(A) an individual; (B); a corporation; (C); a limited liability company; (D) a partnership; (E) a joint venture; (F) an association; (G) a joint-stock company; (H) a business trust; (I) an unincorporated organization; (J) two or more persons having a joint or common interest, including an individual or a corporation acting as a person representative or in any other fiduciary capacity; (K) a government; (L) a governmental subdivision, agency, or instrumentality; (M) a public corporation; or (N) any other legal or commercial entity.

TEX. PROP. CODE. ANN. § 111.004(10).

Here, Wallace is the father of the two beneficiaries of the Wallace Trusts. [Finding of Fact No. 2.] The Texas Property Code, however, does not include the beneficiary of a trust under the definition of a "person." TEX. PROP. CODE. ANN. § 111.004(10). Thus, under section (A) of § 111.004(1), Wallace is not an affiliate because he cannot control, be controlled by, or be under common control with the Wallace Trusts. Moreover, under section (B) of § 111.004(1), to qualify as an affiliate of the Wallace Trusts, Wallace would have to be the father of the Wallace Trusts themselves, not the beneficiaries, which is an impossibility. Accordingly, Wallace is not an affiliate of the Wallace Trusts; thus, he does not have standing to sue under the Nondisparagement Clause.

> b.   *Breach of Contract Under Texas Law*

First, Bajjali and the Wallace Trusts allege that Perry breached the Indemnification Clause. [Pls.' Ex. No. 4 §§ 7.1–7.3]; [Adv. Docket No. 1, ¶ 31.] The Plaintiffs allege that Perry owes them funds that the Wallace-Bajjali Partnership used to avoid indemnity claims. [Pls.' Ex. No. 16.]

Second, Wallace and Bajjali allege that Perry breached the Nondisparagement Clause [Pls.' Ex. No. 4, § 6.3.] Specifically, Wallace and Bajjali assert that Perry breached this clause by making defamatory remarks about them to members of the business community.

52

Texas courts have held that in order to establish a claim for breach of contract, a plaintiff must satisfy four elements: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Valero Mktg. & Supply Co. v. Kalama, Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (citing *Hussong v. Schwan's Sales Enters.*, 896 S.W.2d 320, 326 (Tex. App.—Houston [1st Dist.] 1995, no writ)) (emphasis omitted). The plaintiff must show by a preponderance of the evidence that the breach of contract was the proximate cause of any damages suffered. *Griffin v. Eakin*, 656 S.W.2d 187, 189 n.1 (Tex. App.—Austin 1983, writ ref'd n.r.e.).

### i.    A Valid Contract Exists

Here, Perry testified that he understood that the Purchase Agreement was a binding document and carried with it many obligations.[28] [Finding of Fact No. 38.] Therefore, this Court concludes that a valid contract exists. Accordingly, the first element needed to establish a claim for breach of contract is met.

### ii.    The Plaintiffs Performed Under the Contract

To establish performance, a plaintiff must prove that he tendered or executed his duties under the contract. *See Coastal Mart, Inc. v. Sw. Bell Tel. Co.*, 154 S.W.3d 839, 847 (Tex. App.—Corpus Christi 2005, pet. granted, judgm't vacated w.r.m.) (citing *Ford v. City State Bank of Palacios*, 445 S.W.3d 121, 137 (Tex. App.—Corpus Christi 2001, no pet.)). Under the Purchase Agreement, the Plaintiffs were to relinquish their interest in the entities, with Perry assuming control. Wallace and

---

[28] In the suit at bar, Perry does not deny the validity and enforceability of the Purchase Agreement. [Finding of Fact No. 38.] Indeed, Perry testified to having signed the Purchase Agreement, knowing that he was bound by it. [Finding of Fact No. 38.] Therefore, an analysis of the validity of the Purchase Agreement is unnecessary, thus satisfying the first element of a breach of contract cause of action.

Bajjali resigned their respective positions and transferred all of their interests in accordance with the Purchase Agreement. [Finding of Fact No. 38.]  Therefore, the Plaintiffs have performed their obligations under the Purchase Agreement, thus establishing the second element for a valid breach of contract action.[29]

> iii.  *Perry Breached Multiple Provisions of the Purchase Agreement*

The Plaintiffs assert that Perry breached the duties and obligations of both the Nondisparagement Clause and the Indemnification Clause. A defendant breaches a contract by failing to execute, tender, or perform on a contractual duty.  *See Coastal Mart, Inc.*, 154 S.W.3d at 847.

> (A)  Breach of the Nondisparagement Clause (Section 6.3 of the Purchase Agreement).

The Nondisparagement Clause reads as follows:

> On and after the closing, Perry and his affiliates and each of the Sellers and their affiliates will refrain (and will use their reasonable efforts to cause their family members to refrain) from making disparaging, negative or similar remarks concerning each other to any third-party intended to cause harm to the other's business or business reputation, except to the extent that any party (a) is required to make such remarks by applicable law or regulation or judicial or regulatory process or (b) makes such remarks in or in connection with any pending litigation or other proceeding.

[Pls.' Ex. No. 4, § 6.3.] Perry admitted to breaching this clause on several occasions. [Finding of Fact No. 88.] Perry also admitted to owing damages as a result of the breach. [Finding of Fact No. 85.] Specifically, in reference to the Nondisparagement Clause, Perry testified:

> Q: Okay.  So you don't contest that not only did you breach the contract, but you're even liable for the damages that flow from the breach of this contract, right?

---

[29]  The Wallace Trusts also performed under the Purchase Agreement when the trustee of the Wallace Trusts executed the documents required to be executed under the Purchase Agreement.  Therefore, the Court also concludes that the Wallace Trusts have performed their obligations under the Purchase Agreement.

A: Yes.  There's [sic] consequences for my actions, yes.

[June 1, 2009 Tr. 274:14–275:2.]

In addition to Perry's admission, the evidence presented at trial independently shows that he made disparaging remarks about Wallace and Bajjali.  For example, McGrath received numerous text messages from Perry accusing Wallace and Bajjali of committing fraud. [Finding of Fact No. 53.] For all of these reasons, Perry breached the Nondisparagement Clause in relation to Bajjali.[30]

(B)     Breach of the Indemnification Clause (Section 7.1–7.3 of the Purchase Agreement)

The Plaintiffs assert that Perry breached the Indemnification Clause by failing to indemnify them for the following obligations: (1) liabilities and attorneys' fees relating to the Meadowcrest Loans; (2) principal and interest accrued from the Bank of Texas Loans; (3) principal and interest accrued from the Morton Loans; (4) the One Sugar Lakes Lease;[31] (5) the Creekmont Loan; and (6) the Cypress Loans.

Section 7 of the Purchase Agreement sets forth the following:

> 7.1     Personal Guarantees.  Perry hereby agrees to indemnify, defend and hold harmless the Sellers from all liabilities, obligations, indebtedness and claims arising from the personal guarantees made by the Sellers prior to the closing in connection with the operations of the Partnership and its affiliates, including W.C. Perry Properties Investments, LLC and W.C. Perry Properties Realty Fund, LP.  Each of the Sellers hereby agree to indemnify, defend and hold harmless Perry from all liabilities, obligations, indebtedness and claims arising from the personal guarantees made by Perry, if any, in connection with the operations of WBIF and its affiliates

---

[30]  No evidence was presented showing that Perry breached the Nondisparagement Clause in relation to the Wallace Trusts; thus, this Court concludes that Perry did not breach the Nondisparagement Clause relating to the Wallace Trusts

[31]  The issue of whether any claims against Wallace and Bajjali relating to the One Sugar Lakes Lease should be allowed or disallowed as indemnification claims against Perry will be adjudicated in the adversary proceeding styled *Perry et al. v. One Sugar Lakes Professional Centre Partners, L.P.* [Adv. No. 08-03465, Docket No. 26.]

55

>    7.2   **Partnership Agreement and Regulations.**  Perry agrees to indemnify, defend
>    and hold harmless the Sellers from all liabilities, obligations, indebtedness and claims
>    arising under the Partnership Agreement and the Regulations unless caused by the
>    gross negligence or willful misconduct of the Sellers.
>    7.3   **Notice.**  In the event of an occurrence that would give rise to any party
>    becoming entitled to indemnification under this Paragraph 7, the indemnified party
>    will give the indemnifying party notice thereof, including a full summary of the
>    relevant details.

[Pls.' Ex. No. 4, §§ 7.1–7.3.]

Indemnification is necessary when an indemnitor promises to protect or hold a party harmless

against existing and future loss, liability, or both.  *Wallerstein v. Spirt*, 8 S.W.3d 774, 779 (Tex.

App.—Austin 1999, no pet.).  Here, indemnity is due because under the Purchase Agreement, Perry

indemnified Bajjali and the Wallace Trusts against liability, and indemnification against liability

accrues when the liability has been incurred and is certain.  *See Holland v. Fid. & Deposit Co. of Md.*,

623 S.W.2d 469, 470 (Tex. App.—Corpus Christi 1981, no writ) (holding an indemnitor bound when

the liability is both fixed and certain); *Mullins v. Elieson*, 611 S.W.2d 921, 925 (Tex. Civ.

App.—Amarillo 1981, no writ) (holding that if a liability is indemnified, the obligation is due when

the liability is incurred).  Each of the liabilities for which Bajjali and the Wallace Trusts seek

indemnification arose out of activity that occurred prior to November 15, 2006, the effective date of

the Purchase Agreement.[32]  [Pls.' Ex. No. 4.]

---

[32] Wallace himself was not a partner and therefore not a party to the Purchase Agreement.  [Finding of Fact No. 2.]  Because the Indemnification Clause is incorporated into the Purchase Agreement, the Indemnification Clause, and the rights that flow therefrom, applies only to those Plaintiffs who signed the Purchase Agreement, i.e., Bajjali and the Wallace Trusts.  Wallace is therefore not entitled to invoke the Indemnification Clause.

(i)    Breach of the Indemnification Clause relating
        to Bajjali

A reasonable reading of section 7.1 provides that Perry agreed to indemnify Bajjali and the

Wallace Trusts from any liabilities that arose from their personal guarantees of loans made prior to

November 15, 2006, the effective date of the Purchase Agreement. [Pls.' Ex. No. 4.] Indeed, Perry

himself testified that, although he is not aware of any liabilities of Bajjali and the Wallace Trusts at

this time for which he needs to indemnify them, he conceded that if such liabilities exist, he would

need to indemnify them. [Finding of Fact No. 86.] At trial, Bajjali testified that he had personally

guaranteed the Flagship Loan, the Amegy Loan, the Morton Loans, the Creekmont Loan, the bank

of Texas Loans, and the Cypress Loans. [Finding of Fact Nos. 102–106.] Accordingly, this Court

concludes that Perry agreed to indemnify Bajjali and that the loans

The Purchase Agreement requires Bajjali and the Wallace Trusts to give Perry notice of the

need for indemnification. [Pls.' Ex. No. 4, § 7.3.] Actual notice has been defined as:

> [E]xpress or positive personal information or knowledge directly communicated to the
> person to be affected. In a more comprehensive sense, the term also embraces
> knowledge of all those facts which reasonable inquiry would have disclosed, the duty
> of inquiry extending only to matters that are fairly suggested by the facts really known.
> In other words, whatever fairly puts a person upon inquiry is actual notice of the facts
> that would have been discovered by reasonable use of the means at hand.

*Flack v. First Nat'l Bank of Dalhart*, 226 S.W.2d 628, 631–32 (Tex. 1950) (citing 31 Tex. Jur. Sec.

3, pp. 359–60); *see also Dean's Campin' Co. v. Hardsteen*, No. 01-00-01190-CV, 2002 WL 1980840,

at *3 n.3 (Tex. App.—Houston [1st Dist.] Aug. 29, 2002, pet. denied) (finding that an indemnifying

party received notice of indemnification by nature of being a co-defendant in the suit).

Bajjali filed a proof of claim, which was then amended, against Perry's bankruptcy estate

asserting indemnification for all of the liabilities previously discussed. [Finding of Fact No. 100];

[Pls.' Ex. No. 56.] The proof of claim qualifies as sufficient notice in satisfaction of section 7.3 of the Purchase Agreement because it directly communicated to Perry the necessary information. *See Flack*, 226 S.W.2d at 631–32. Additionally, Perry admitted that he knew the Flagship Loan—one of the Meadowcrest Loans—was a nonperforming loan. [Finding of Fact No. 88.] Perry is also a plaintiff in a lawsuit against Bajjali relating to the One Sugar Lakes Lease, in which Wallace and Bajjali are asking for the amount due to them in a counterclaim. *Perry v. One Sugar Lakes Prof'l Ctr. Partners, LP*, No. 08-03465 (Bankr S.D. Tex. Jan. 3, 2008). This counterclaim also qualifies as notice to Perry in satisfaction of section 7.3 of the Purchase Agreement.

Aside from these circumstances, Bajjali credibly testified that: (1) he was a personal guarantor on all of the loans; (2) he provided Perry notice regarding his entitlement to indemnification; and (3) Perry failed to indemnify him for the losses accrued to restructure the loans. [Finding of Fact Nos. 102–106.] Thus, Perry breached the Indemnification Clause as to Bajjali.

Based on the testimony and evidence presented at trial, this Court concludes that: (1) Perry agreed to indemnify Bajjali from any liabilities that arose from his personal guaranties of loans made by the Partnership and its affiliates prior to the effective date of the Partnership Agreement; and (2) Perry has breached the Indemnification Clause as to Bajjali.

> (ii)    Breach of the Indemnification Clause relating to the Wallace Trusts

Perry breached the Indemnification Clause in relation to the Wallace Trusts because Perry failed to indemnify the Wallace Trusts from the Bank of Texas Loans, and the Flagship Loan, one of the Meadowcrest Loans. The Purchase Agreement only indemnifies the Wallace Trusts from "personal guarantees." [Pls.' Ex. No. 4, § 7.1.] Because the Wallace Trusts were personal guarantors

only on the Flagship Loan and the Bank of Texas Loans, Perry's obligation to the Wallace Trusts is limited to those specific loans. Moreover, the filing of a proof of claim against Perry's bankruptcy estate requesting indemnification satisfies the notice requirement of section 7.3 of the Purchase Agreement. *Flack*, 226 S.W.2d at 631–32. Therefore, Perry has breached the Indemnification Clause in relation to the Wallace Trusts because: (1) Perry owes an obligation to indemnify the Wallace Trusts; (2) the Wallace Trusts provided sufficient notice for indemnification; and (3) Perry has failed to indemnify the Wallace Trusts.

c.    *Damages*

In a contract cause of action, damages may be broken into one of two categories: actual or consequential. The Texas Supreme Court has held that "[i]n an action for breach of contract, actual damages may be recovered when the loss is the natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). Indeed, these damages are "intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (quoting *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001)).

Consequential damages are damages that occur naturally, but do not necessarily stem from the breach. *See Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995) (quoting *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex. 1992)), *overruled on other grounds*, *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45 (Tex. 2007). Moreover, consequential damages are not recoverable unless the damages were foreseeable. *U.S. ex rel. CMC Steel Fabricators, Inc. v. Harrop Constr. Co.*, 131 F. Supp. 2d 882, 890 (S.D. Tex. 2000); *see also Mead*, 615 S.W.2d at 687. Accordingly, in order to recover consequential damages, the damages must have been foreseeable by

59

the parties, directly traced to the breach, and result from the breach. *See Mead*, 615 S.W.2d at 687.
Thus, the parties must reasonably appreciate that "misdeeds [could] arise to the magnitude of
destruction" so claimed, and if they cannot be reasonably thought of at the time the contract was
made, consequential damages are inappropriate. *CMC Steel*, 131 F. Supp. 2d at 892.

Bajjali and the Wallace Trusts are also eligible to recover attorneys' fees. "A person may
recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a
valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM.
CODE ANN. § 38.001. The Plaintiffs must prevail on their breach of contract claim and recover
damages in order to recover attorneys' fees. *Green Int'l v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997)
(citing *State Farm Life Ins. v. Beaston*, 907 S.W.2d 430, 437 (Tex. 1995)).

> i.    *Bajjali's Damages*
>
> (A)    Nondisparagement Clause Damages
>           (Actual Damages)

Perry breached the Nondisparagement Clause only relating to Bajjali. Bajjali, however, failed
to provide evidence of any losses or consequential damages suffered because of the disparagement.
The testimony and evidence fails to satisfy, by a preponderance of the evidence, that Perry's
disparaging remarks caused harm to Bajjali's business or business reputation. Therefore, Bajjali may
not recover under this claim because he has fallen short of satisfying his burden of proof for damages.

> (B)    Indemnification Damages (Actual Damages)

Bajjali has suffered injury from Perry's breach because Bajjali was a personal guarantor on
the loans for which he seeks indemnification. [Finding of Fact Nos. 102–106.] "The mitigation of
damages doctrine is an affirmative defense that requires an injured party, following a breach, to

60

exercise reasonable care to minimize his damages if it can be done with slight expense and reasonable effort." *Allen v. Am. Gen. Fin., Inc.*, 251 S.W.3d 676, 686 (Tex. App.—San Antonio 2007, pet. granted) (citing *Great Am. Ins. Co. v. N. Austin. Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995)). This Court concludes that the restructuring of the loans that Bajjali guaranteed constitutes proper mitigation of damages by Bajjali. At trial, Bajjali testified that the Wallace-Bajjali Partnership borrowed $3.78 million from investors in order to restructure loans that he personally guaranteed. [Finding of Fact Nos. 102–106.]   Therefore, because Bajjali—through the Wallace-Bajjali Partnership's successful restructuring of the various guaranteed obligations—successfully mitigated damages, Perry is liable to Bajjali for the cost of the restructuring of the loans.

The cost of restructuring the loans is calculated as follows: (1) With respect to the Flagship Loan, the Wallace-Bajjali Partnership paid off this loan by making a payment of $1,000,000.00 [Finding of Fact No.102.] Therefore, the cost here is $1,000,000.00. (2) With respect to the Amegy Loan, the Wallace-Bajjali Partnership paid $173,704.00 to avoid an indemnity claim from Amegy Bank. [Finding of Fact No. 102.] Therefore, the cost here is $173,704.00. (3) With respect to the Morton Loans, the Wallace-Bajjali Partnership paid down the balance of these obligations by $76,915.00. [Finding of Fact No. 103.] Therefore, the cost here is $76,915.00. (4) With respect to the Creekmont Loan, the Wallace-Bajjali Partnership paid down the balance of this obligation by $911,956.00. [Finding of Fact No. 104.] Therefore, the cost here is $911,956.00. (5) With respect to the Bank of Texas Loans, the Wallace-Bajjali partnership paid down the balance of these obligations by $417,773.00. [Finding of Fact No. 105.] Therefore, the cost here is $417,773.00. (6) With respect to the Cypress Loans, the Wallace-Bajjali partnership paid $1,199,967.00 to Amegy Bank. [Finding of Fact No. 106.] Therefore, the cost here is $1,199,967.00.

The sum of $1,000,000.00, plus $173,704.00, plus $76,915.00, plus $911,956.00, plus $417,773.00, plus $1,199,967.00 equals $3,780,315.00. Therefore, the total damages to Bajjali are $3,780,315.00.

(C)     Special Damages

While the term special damages is not specifically defined in the Federal Rules of Civil Procedure, it has been interpreted to mean "those elements of damages that are the natural, but not the necessary, consequence of defendant's conduct, and usually stem from the particular circumstances of the case." *NTBS Storage & Retrieval, Inc. v. Kardex Sys., Inc.*, No. 3:98-CV-0996-M, 2001 U.S. Dist. LEXIS 24605, at *3 (N.D. Tex. Mar. 8, 2001) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1310 at 700 (2d ed. 1990)); *see also Tex. A&M Res. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 404 (5th Cir. 2003) (finding special damages to be unusual or indirect costs, beyond the ordinary consequences of a breach); *Berwick v. New World Network Int'l*, No. 06 Civ. 2641 (JGK), 2007 WL 949767, at *14 (S.D.N.Y. Mar. 27, 2007) (finding special damages insufficiently pled when the plaintiffs alleged damages to their reputation and generally alleged lost profits associated with a tortious interference claim) (citing *Dooner v. Keefe, Bruyette & Woods, Inc.,* No. 00 Civ. 572(JGK), 2003 WL 135706, at * 5 (S.D.N.Y. Jan. 17, 2003). Indeed, in Texas state courts, lost profits have consistently been considered special damages. *Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 66 (Tex. App.—Texarkana 2004, pet. denied).

An award of special damages is inappropriate in this suit. Under Rule 8(a)(3), "[a] pleading that states a claim for relief must contain . . . a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3);[33] *see also Lesikar v. Rappeport*,

_____

[33]   Rule 8 is made applicable to the Adversary Proceeding pursuant to Bankruptcy Rule 7008.

33 S.W.3d 282, 305 (Tex. App.—Texarkana 2000, pet. denied) (finding that in order to be recoverable, special damages must be pled).  Further, a plaintiff must have sufficient notice when special damages are being sought.[34]  *Burke* 138 S.W.3d at 67 (Tex. App.—Texarkana 2004, pet. denied).

Bajjali does not satisfy the pleading requirements of Rule 8(a)(3).  The complaint seeks only actual damages and does not specifically plead lost profit damages. [Finding of Fact No. 107.] While the complaint generally mentions actual and exemplary damages, nowhere do the Plaintiffs—here, Bajjali—discuss or plead for lost profit damages.  Bajjali merely asserted at trial that he suffered lost profits.  His passing testimonial reference to lost profit damages not only fails to satisfy Rule 8(a)(3), but also violates the requirement of sufficient notice for special damages.  Thus, Bajjali has not met his pleading burden and may not recover damages for lost profits.

Further, even if this Court were to find that Rule 8(a)(3) is satisfied, Bajjali has failed to plead lost profits with specificity.  According to Rule 9(g),[35] when "an item of special damage is claimed, it must be specifically stated."  Fed. R. Civ. P. 9(g).  Here, Bajjali has failed to plead special damages, let alone specifically state them. [Finding of Fact No. 107.]  Therefore, in the alternative, this Court would deny recovery of lost profits pursuant to Rule 9(g).

Finally, even if this Court is incorrect in concluding that Bajjali's lost profits are special damages, Bajjali has failed to adduce testimony of actual lost profits.  "The measure of damages for the loss of profits as consequential damages means net profits.  Net profits means that what remains

---

[34] This Court, like other courts, uses the terms "special damages" and "consequential damages" interchangeably. *See Lesikar*, 33 S.W.3d at 305.

[35] Rule 9 is applicable to the Adversary Proceeding pursuant to Bankruptcy Rule 7009.

in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business." *S. Plains Switching, Ltd. v. BNSF Ry.*, 255 S.W.3d 690, 705 (Tex. App.—Amarillo 2008, pet. denied). While not requiring precise calculation, the lost profits must still be shown to a reasonable certainty. *Id.* Damages may be awarded based on estimates of the facts in the case. *Id.* (citing *Interceramic, Inc. v. S. Orient R.R.,* 999 S.W.2d 920, 929 (Tex. App.—Texarkana 1999, pet. denied)).

Bajjali did not testify, nor did the Plaintiffs provide any evidence, that the borrowed $3,780,315.00 was tied to specific projects or that such projects would have generated any profit. While this Court would not require an exact dollar amount for lost profits, the number must still be reasonably certain. *S. Plains Switching*, 255 S.W.3d at 705. Therefore, because it is not reasonably certain that Bajjali would have lost any profitable business deals merely because he was forced to borrow $3,780,315.00,[36] even if lost profits are not considered special damages, this Court will not award lost profit damages due to insufficient evidence.

Therefore, this Court concludes that lost profits stemming from the breach of the Indemnification Clause are not actual damages, but instead special damages. Further, Bajjali has failed to satisfy the requirements of Rules 8(a)(3) and 9(g). Therefore, this Court denies an award of special damages. Moreover, even if this Court is incorrect in concluding that the lost profit damages are special damages, Bajjali neither adduced testimony nor introduced exhibits that lost profits were reasonably certain.

---

[36] Although it was the Wallace-Bajjali Partnership, not solely Bajjali, which borrowed the money to restructure the guaranteed loans, Bajjali is a partner of the Wallace-Bajjali Partnership, and therefore is personally liable for all of the loans the Wallace-Bajjali Partnership received. Thus, this Court concludes that Bajjali himself did mitigate the damages.

In sum, although this Court declines to award to Bajjali three types of damages which he seeks—damages relating to the Nondisparagement Clause, special damages, and liquidated damages—the Court does award to Bajjali actual damages relating to Perry's breach of the Indemnification Clause.  The amount of the award is $3,780,315.00.  The Court also awards attorneys' fees and court costs to Bajjali.  Counsel for Bajjali is directed to submit his firm's invoices to the Court within seven calendar days of the date that this Memorandum Opinion is entered on the docket.  Further, counsel for Bajjali is to submit invoices to Perry's counsel within seven calendar days from the date that this Memorandum Opinion is entered on the docket to determine whether he agrees that the requested fees and expenses are reasonable or whether a separate hearing needs to be held on the reasonableness of the requested attorneys' fees to be awarded to Bajjali for prosecuting the complaint.

ii.     *The Wallace Trusts' Damages*

Although Perry breached the Indemnification Clause in relation to the Wallace Trusts, the Wallace Trusts have suffered no damages because the Wallace-Bajjali Partnership restructured the two loans which the Wallace Trusts had guaranteed—the Flagship Loan and the Bank of Texas Loans. [Finding of Fact Nos. 102 & 105.] Stated differently, because Bajjali and the Wallace Trusts had both guaranteed the Flagship Loan and the Bank of Texas Loans, when the Wallace-Bajjali Partnership mitigated the damages by restructuring these two loans, the Wallace Trusts necessarily benefitted by such restructuring because they did not have to come out of pocket at all; only Bajjali had to come out of pocket (by using assets of the Wallace-Bajjali Partnership to achieve the

restructuring).[37]   Thus, the Wallace Trusts incurred no damages.

          *d.*       *The Contract Claims and Non-dischargeability under 11 U.S.C. §*
                    *523(a)(6)*

11 U.S.C. § 523(a)(6) states that "a discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt . . . [that is the result of] willful and malicious injury by the debtor to another entity." 11 U.S.C. § 523(a)(6).   In explaining the meaning of § 523(a)(6), the Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury." *Kawaauahau v. Geiger*, 523 U.S. 57, 61 (1998). The Supreme Court has further held that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of section 523(a)(6)." *Id.* at 64.

The Fifth Circuit expanded on the *Geiger* interpretation of § 523(a)(6) by holding that "willful and malicious injury is a unitary concept entailing a single two-pronged test." *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998).   There must either be an "objective substantial certainty of harm or a subjective motive to cause harm." *Id.* at 606; *see also Texas v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998).   When applying this two-pronged test, courts should look at the record as a whole, not simply focus on specific pieces of evidence. *See Suggs v. Stanley (In re Stanley)*, 224 F. App'x 343, 348 (5th Cir. 2007) (holding that the bankruptcy court's finding of willful and malicious intent was not in clear error, based on a reading of the entire record).

In analyzing the subjective motive to harm, the Honorable Marvin Isgur has noted that "the

---

[37]   There is nothing in the record to indicate that the Wallace Trusts were partners in the Wallace-Bajjali Partnership.  The record indicates only that Wallace and Bajjali are the two partners in the Wallace-Bajjali Partnership. Thus, the Wallace Trusts have never had to come out of their own pocket to mitigate damages.

Fifth Circuit equated having a subjective motive to harm to acting with the desire to cause injury."

*Guerra & Moore, Ltd. LLP v. Cantu (In re Cantu)*, 400 B.R. 104, 108 (Bankr. S.D. Tex. 2008) (citing

*In re Miller*, 156 F.3d at 604). "Moreover, §523(a)(6)'s formulation triggers in the lawyer's mind the

category 'intentional torts,' which generally require that the actor intend the *consequences* of an act,

not simply the act itself." *Geiger*, 523 U.S. at 58. A creditor must prove the willful and malicious

standard for § 523(a)(6) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291

(1991); *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005).

Perry willfully and maliciously breached the Purchase Agreement only in relation to Bajjali.[38]

On September 22, 2006, Hoffman, Perry's administrative assistant, sent a provocative e-mail to Perry

stating:

> They [Wallace and Bajjali] treat you with no respect and like a child. They sluff you
> off . . . They will NOT DO AS YOU ASK IN A TIMELY MANNER and it
> thoroughly pisses me off . . . Will, I am sorry but this is the most belittling e-mail and
> I certainly would not stand for anyone to talk to me that way.

[Finding of Fact No. 62.][39]  Three days later, Perry responded in an e-mail to Hoffman, indicating a

calculated plan to injure Wallace and Bajjali. The e-mail states:

> I wanted to let you know that I am going filing bankruptcy per my attorneys advice.
> Please do not worry as this is part of my big plan I am going to be hatching this week.
> Dave [Wallace] and Costa [Bajjali] think they can pull a wool over my eyes they have
> no idea what is about to happen and I just love it. They [Wallace and Bajjali] will
> walk away with nothing after this week and oh Dave [Wallace] can kiss his political
> career goodbye. Costa [Bajjali] will be getting all the blame plus a hell of a lot of
> debt. The master is at work and I have them by there balls. Costa should have never

---

[38]  Because Wallace was not a party to the Purchase Agreement, he may not invoke this document to obtain a
conclusion from this Court that Perry willfully and maliciously injured him in relation to the Nondisparagement Clause.
As for the Wallace Trusts, even though they are parties to the Purchase Agreement, there is insufficient evidence to show
that Perry willfully and maliciously injured them like he did with respect to Bajjali.

[39]  Hoffman's e-mail to Perry was in response to an e-mail Bajjali sent to Perry, which Perry subsequently
forwarded to Hoffman. [Pls.' Ex. No. 36.]

67

sided with Dave.

[Finding of Fact No. 62.]  Perry further alluded to a calculated plan to injure Wallace and Bajjali in a separate email that read, "the ball has started rolling now I cannot stop it about dave [Wallace]." [Finding of Fact No. 64.]  Indeed, Perry intended to cause Bajjali to incur "a hell of a lot of debt" and to destroy Wallace's political career.  [Finding of Fact No. 62.]

Moreover, Bajjali testified that Perry sent him multiple text messages stating that Bajjali would never see a dime of his money, further evidencing Perry's malicious intent.  [Finding of Fact No. 89.]  Additionally, Perry's conduct surrounding the dissolution of the Partnership showed a pattern of retaliation.  In his e-mail to Hoffman, Perry alluded to the harm Wallace and Bajjali would suffer.  [Finding of Fact No. 62.]  Perry is also a sophisticated businessman.  [Finding of Fact Nos. 7 & 8.]  Therefore, he understood the consequences of his actions.  Indeed, he intended that "big changes" take place at Perry Properties.  [Finding of Fact No. 46.]  Under all of these circumstances, this Court concludes that Perry also knew with substantial certainty that Bajjali would suffer harm from his (i.e., Perry's) failure to indemnify him from defaulting loans.

In contrast, there is no evidence suggesting that Perry acted with malice in relation to the Wallace Trusts.  No evidence was presented that Perry had a subjective motive to harm the Wallace Trusts.  Moreover, no evidence was presented indicating that Perry intended for the Wallace Trusts to incur costs in relation to Perry's failure to indemnify.  Simply put, the Wallace Trusts were collateral damage, thus making a § 523(a)(6) non-dischargeability conclusion inappropriate.

Accordingly, under the circumstances described above, this Court concludes that Perry's acts evidence a subjective motive to cause harm to Bajjali.  Alternatively, this Court concludes that Perry's actions had an objective substantial certainty of harm toward Bajjali.  *In re Miller*, 156 F.3d at 606.

As a result, any damages stemming from the breach of the Purchase Agreement are non-dischargeable as to Bajjali under § 523(a)(6).

2.   *Defamation Claims*

a.   *Standing for Defamation Claims*

To have standing in Texas state courts, "a plaintiff must be personally aggrieved; his alleged injury must be concrete and particularized, actual or imminent, and not hypothetical." *Inman*, 252 S.W.3d at 304–05. Whether a plaintiff has standing is determined as of the filing of a lawsuit in the trial court. *In re Vogel*, 261 S.W.3d at 921; *Tex. Ass'n*, 852 S.W.2d at 446 n.9.

Perry's defamatory statements caused damage to both Wallace and Bajjali—specifically, to their personal and business reputations, as evidenced by, among other things, the testimony adduced from the following witnesses: (1) Kaleta testified that he is now cautious when conducting business with Wallace and Bajjali; [Finding of Fact No. 78]; (2) McGrath testified that he extracted himself from all involvement with Wallace; [Finding of Fact No. 81]; (3) Wallace testified that his relationship with the Shahs deteriorated after they heard the allegations against Wallace; [Finding of Fact No. 82]; (4) Wallace also testified that Perry's accusations against Wallace severely damaged his political career; [Finding of Fact No. 83]; and (5) Wallace testified that the defamatory statements have negatively affected his family life, particularly his relationships with his wife and two daughters; indeed, at trial, Wallace noted with dejection that his ability to be a role model to his two daughters has been diminished. [Finding of Fact No. 83.] Notably, the aforementioned circumstances occurred only after Perry published the defamatory statements. Therefore, because the record indicates that Wallace and Bajjali were personally aggrieved and had their reputations harmed by the accusations of Perry, they have standing to sue for defamation. *See Inman*, 252 S.W.3d at 304–05.

b.      *Defamation Under Texas Law*

To satisfy a claim for defamation, Texas law requires the plaintiff to prove the defendant

engaged in the following actions: "(1) published a statement; (2) that was defamatory concerning the

plaintiff; and (3) while acting with either actual malice, if the plaintiff was a public figure, or

negligence, if the plaintiff was a private individual, regarding the truth of the statement." *Grand*

*Champion Film Prod., L.L.C. v. Cinemark USA, Inc.*, 257 S.W.3d 478, 481 (Tex. App.—Dallas,

2000, no pet.) (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)).

i.      *Published Statements*

A statement is published when it is said orally, put into writing or in print, and the statement

was published in such a way that third parties are capable of understanding its defamatory nature.

*Austin v. Inet Techs., Inc.* 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.) (citing *Ramos v.*

*Henry C. Beck Co.*, 711 S.W.2d 331, 335 (Tex. App.—Dallas 1986, no writ)); *see also Marshall*

*Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 396 (Tex. App.—Houston [1st Dist.] 1993, writ

dism'd, w.o.j.).  A third party is deemed to have understood the defamatory nature of a statement if

a reasonable person would have understood the statement under the circumstances. *Marshall Field*

*Stores*, 859 S.W.2d at 396 (citing *First State Bank of Corpus Christi v. Ake*, 606 S.W.2d 696, 701

(Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.)).  An e-mail, just like a letter or a note, is a

means for a statement to be published so that third parties are capable of understanding the

defamatory nature of the statement.  Accordingly, this Court concludes that an e-mail sent to third

parties constitutes publication for defamation purposes. *Van Ngyuyen v. Hoang,* No. 01-07-00136-

CV, 2009 WL 469347, at *2–3 (Tex. App.—Houston [1st Dist.] Feb. 26, 2009, no pet.) (noting that

the sending of an e-mail constitutes publication for defamation purposes).

ii.    *Defamatory Statements*

A statement is defamatory when "it tends to injure a person's reputation and thereby expose[s] the person to public hatred, contempt, ridicule, or financial injury, or [where it] impeach[es] any person's honesty, integrity, virtue, or reputation." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex. App.—Austin 2007, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 73.001).

A published statement must be a false statement of fact to be defamatory in nature. *Skipper v. Meek*, No. 03-05-00566-CV, 2006 WL 2032527, at *7 (Tex. App.—Austin, July 21, 2006, no pet.) (citing *Abbot v. Pollock*, 946 S.W.2d 513, 519 (Tex. App.—Austin 1997, writ denied)). Further, the statement must be objectively, verifiably false. *Id.* (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)).

In Texas, the burden is on the plaintiff to prove the falsity of a defamatory statement, whether the statement is made about private individuals or public officials. *See Bentley v. Bunton*, 94 S.W.3d 561, 586 (Tex. 2002) (holding that public officials must prove the defamatory statements made are false); *Bandy v. White*, No. 03-01-00444-CV, 2002 WL 1727994, at *5 (Tex.App.—Austin July 26, 2002, no pet.) (concluding that the plaintiff has the burden to prove falsity in a suit between private individuals); *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex. App.—Houston [14th Dist.] 1997, no writ) (concluding that a private individual plaintiff bears the burden of showing falsity to recover against media defendant). The plaintiff must prove the falsity of a statement by a preponderance of the evidence. *Bentley*, 94 S.W.3d at 587; *Turner*, 38 S.W.3d at 117.

For a statement to be defamatory, plaintiffs must show that any defamatory publications "concerned" or referred to them. *Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 144 (Tex.

71

App.—Fort Worth 2009, pet. denied) (citing *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 429 (Tex. 2000)). "A person is referred to in a defamatory statement if he is named in the statement or if those who know the person would understand that the statement was referring to the person." *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 180 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960)). "[B]y omitting key facts and falsely juxtaposing others, a publication may be both false and defamatory." *Houseman v. Publicaciones Paso Del Norte*, 242 S.W.3d 518, 525 (Tex. App.—El Paso 2007, no pet.) (citing *Turner* 38 S.W.3d at 118 (Tex. 2000)). To determine whether a statement is defamatory, "[a] defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154 (Tex. 2004) (quoting *Turner* 38 S.W.3d at 114(Tex. 2000)) (internal quotation marks omitted). "Common sense requires courts to understand the statement as ordinary men and women would." *Moore v. Waldrop*, 166 S.W.3d 380, 385 (Tex. App.—Waco 2005, no pet).

### iii.   *Actual Malice or Negligence*

To determine whether a standard of actual malice or negligence should apply to a defamatory statement, this Court must first determine whether Wallace and Bajjali are each: (1) a general-purpose public figure; (2) a limited purpose public figure; (3) a public official; or (4) a private individual. *WFAA-TV*, 978 S.W.2d at 571. A public official is considered a private individual if the defamatory statements are not related to his official conduct. *Foster v. Laredo Newspapers*, 541 S.W.2d 809, 817–18 (Tex. 1976).

### (A)   Wallace and public official status

As mayor of Sugar Land, Texas and a candidate for Congressional District number 22,

[Finding of Fact Nos 17, 66], Wallace maintained the status of a public official with respect to all statements related to his public office. A mayor is considered a public official for defamation purposes. *See Turner*, 38 S.W.3d 103, 109 (Tex. 1989) (concluding that a mayoral candidate was a public official for defamation purposes). A defendant must act with actual malice if the defamatory statements are related to the official conduct of the public official. *Foster*, 541 S.W.2d at 812.

A defendant acts with actual malice if the defamatory statement is made with "knowledge that it was false or with reckless disregard of whether it was false or not." *WFAA-TV*, 978 S.W.2d at 571 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 289–90 (1964)). Reckless disregard requires a high degree of probability that the statement was false; moreover, the defendant must subjectively suspect falsity of the defamatory statements. *St. Amant v. Thompson*, 390 U.S. 727, 732–33 (1968); *Bentley*, 94 S.W.3d at 595–96. To satisfy actual malice, it is not sufficient that a prudent person would have verified the facts. *See St. Amant*, 390 U.S. at 731; *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005). "[E]vidence that a failure to investigate was contrary to a speaker's usual practice and motivated by a desire to avoid the truth may demonstrate the reckless disregard required for actual malice." *Bentley*, 94 S.W.3d at 591. A plaintiff may prove a defendant's state of mind using circumstantial evidence, and motive may bear a relation to the actual malice inquiry. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989). Further, one may not automatically overcome evidence of actual malice merely by believing that the statements made were true. *St. Amant*, 390 U.S. at 732.

Here, Wallace testified that he was the mayor during the time the defamatory statements were

73

released. [Finding of Fact No. 17.][40]   Additionally, Wallace was a candidate for Congressional District 22 during part of the events in question.[41] [Finding of Fact Nos. 26, 33,, & 71.] Accordingly, Wallace maintains a public official status with regard to the defamatory statements made about him related to his public official status. This Court finds that all the statements made regarding Wallace are in relation to his public official position. Therefore, the actual malice standard will apply to all statements made relating to Wallace.

(B)      Bajjali and private individual status

Bajjali maintains the status of a private individual in relation to all defamatory statements made against him. A private individual, for the purpose of a defamation action, is any individual who is not considered a public figure, limited purpose public figure, or public official. *Foster*, 541 S.W.2d at 818. An individual who does not engage the attention of the public—in a prominent manner—in an attempt to resolve a public question or issue is generally considered a private individual. *See Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 168 (1979).

A defendant need only act in a negligent manner when making statements about a private individual to be liable for defamation. *WFAA-TV*, 978 S.W.2d at 571 (citing *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)). Texas courts have defined negligence in the defamation context as the "failure to investigate the truth or falsity of a statement before publication, and [the] failure to act as a reasonably prudent [person]." *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 631 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (citing *El Paso Times, Inc. v. Trexler*, 447 S.W.2d

---

[40]   Wallace was mayor from 2002-2008. The evidence shows that Perry made the defamatory statements at various times during this period.   For example, Perry e-mailed Hoffman on September 21, 2006 with a link to the Blog, instructing her to print it out and anonymously distribute it. [Finding of Fact No. 75.]

[41]   For example, Perry e-mailed Hoffman on September 21, 2006 with a link to the Blog, instructing her to print it out and anonymously distribute it. [Finding of Fact No. 75.]

74

403, 406 (Tex. 1969)).

Bajjali qualifies under the private individual standard. Bajjali has never been elected to, or run for, public office. Indeed, Bajjali was a former program manager for Dell Corporation who became involved in real estate development in 2004. [Finding of Fact No. 21.] No exhibits were introduced, and no testimony was adduced, that Bajjali assumed extensive prominence in the resolution of public issues. Therefore, Bajjali is considered to be a private individual in relation to his defamation action against Perry.

        *c.*      *Perry Defamed Wallace and Bajjali*

            *i.*      *The Blog*

                (A)     Perry published the defamatory statements

As discussed *supra*, the sending of an e-mail is considered publication for defamation purposes. Perry published the defamatory statements relating to Wallace when he sent several individuals a link to the Blog. [Finding of Fact No. 75.] Indeed, the Blog contained several defamatory statements regarding Wallace. For example, the Blog insinuated that Wallace was an arms dealer. [Finding of Fact No. 76.] Therefore, Perry's e-mails constitute a publication based upon Texas law. Further, Perry published the information from the Blog by informing Frishberg of the contents within the Blog. [Finding of Fact No. 51.]

                (B)     Defamatory Statements in the Blog Concerned Wallace

The Blog asserts, as fact, that: (1) Mark Thatcher earned millions of dollars as an arms dealer selling weapons to Saudi Arabia; and (2) Mark Thatcher helped finance a coup attempt in Equatorial Guinea. [Pls.' Ex. No. 21.] Using common sense and examining these assertions in the Blog "in light of the surrounding circumstances based upon how a person of ordinary intelligence would

75

perceive it," this Court concludes that they both concerned and defamed Wallace.

The Blog is written in such a way that the accusations against Mark Thatcher are imputed to Wallace. This objective was accomplished by making the subject of the Blog posting solely about Wallace while omitting important facts and falsely juxtaposing others. *Houseman*, 242 S.W.3d at 525. First, the title of the Blog posting is "Some Info On David Wallace." [Pls.' Ex. No. 21.] There is absolutely no reference in the title to Mark Thatcher; hence, a person of ordinary intelligence would believe that the Blog concerns Wallace. The author of the Blog wrote a short introduction to the Blog entry before posting a block of text containing numerous negative statements about Wallace. The introduction reads as follows:

> Some folks have asked why I believe David Wallace to be unethical, corrupt, and unfit to represent the GOP in the CD22 Congressional race, even as a write-in with no significant chance of winning. Well, I received the following item tonight that supplies a neat summary of the problems with David Wallace. I have all or almost all of the documents and articles in question, though I was having difficulty uploading them for my site

[Pls.' Ex. No. 21.]

After introducing the Blog, the author posts what he titled "[an] item . . . that supplies a neat summary of the problems with David Wallace." [Pls.' Ex. No. 21.] This "neat summary" proceeds to link Wallace and Mark Thatcher so closely that the actions of Mark Thatcher are impliedly imputed to Wallace. For example, near the very beginning of the Blog posting, it states that "A November 23, 1991 article in the Guardian (London) identifies Wallace as a business partner of Mark Thatcher, son of former British Prime Minister Margaret Thatcher. The article reports that Wallace and Thatcher were business partners in a firm identified as Emergency Networks, Inc. C." [Pls.' Ex. No. 21.] Importantly, the Blog posting has no sort of paragraph structure, flowing from one negative sentence

about Wallace to another.  This format contributes to the linking of Wallace to Mark Thatcher.  As

another example, a section of the posting discussing Wallace's alleged wrongdoings at Emergency

Networks, Inc. flows directly into a section discussing Mark Thatcher's alleged arms dealings with

Saudi Arabia.[42]  [Pls.' Ex. No. 21.]  Moreover, sandwiched between two sections discussing Mark

Thatcher's alleged involvement in selling weapons to Saudi Arabia is the following allegation:

> An October 10, 1994 article in The Guardian (London) reported that David Wallace
> and Mark Thatcher were partners in Grantham Company, an investment company
> that would "look for companies on hard times and put up the money with some
> hands-on management" said one associate.  The article also reported that Thatcher
> in 1992 was named in a US court [sic] in connection with a  $4 billion payment to
> a Saudi national by Rolls-Royce and British Aerospace to help them with a defense
> contract with Saudi Arabia.

[Pls. Ex. No. 21.]

A similar juxtaposition is used in linking allegations that Mark Thatcher helped finance a coup

attempt in Equatorial Guinea to Wallace:  "[A]n April 5, 2005 Dallas Morning News article reported

that Mark Thatcher in a plea bargain agreement [sic] pleaded guilty in South Africa to helping finance

a coup attempt in Equatorial Guinea. . . . An October 2, 1994 article in The Observer Newspaper . .

. revealed that Mark Thatcher and his business partner were being sued under anti-racketeering, or

RICO, legislation."  [Pls.' Ex. No. 21.]  Moreover, other quotations are juxtaposed within the Blog

posting, with little or no context, linking Wallace to Mark Thatcher and arms dealings.  The Blog

posting states that "The 4/25/95 article in The Sunday Times reported that Grechen Hyland, a

financial controller of Ameristar [sic] claimed that 'Wallace wired large sums of money to Indonesia

---

[42]  An example of this "stream of consciousness" writing style reads as follows: "An October 17, 1994 article
in The Independent—London [sic] Emergency Networks, Inc. was placed in Chapter 7 bankruptcy in 1994.  A November
25, 1992 article in The Guardian (London) states that a secret United States government communications [sic] identified
Mark Thatcher as being involved in a Saudi Arabia arms deal."  [Pls. Ex. No. 27.]

without supporting documents.  I lost count of how many times I requested documents of these outgoing wire transfers.'" [Pls. Ex. No. 21.]  Indeed, the Blog alleges that "A January 22, 1995 article in the Mail on Sunday (London) reported that Barnet Skelton, Jr. an attorney investigating Ameristar [sic] stated that *Wallace was simply a pawn of Mark Thatcher*." [Pls. Ex' No. 21] (emphasis added).  The Blog goes on to post that Wallace used Thatcher's money to take over Ameristar.  [Pls.' Ex. No. 21.]

Finally, the Blog not only alleges that Margaret Thatcher viewed Wallace as a negative influence on her son, but also further linked Mark Thatcher's actions to Wallace.  Specifically, the Blog alleges that:

> Margaret Thatcher was encouraging her son Mark to "distance himself from Wallace" and that Wallace was asked by Ms. Thatcher to resign as Treasurer of her Foundation. . . . It appears that David Wallace and Mark Thatcher were business partners in at least two failed businesses from about 1990, shortly after Wallace filed personal bankruptcy [sic] until 1995 when the suit by Laughlin was settled, during the time that Thatcher was identified as profiting from arms deals involving Saudi Arabia and Iraq.

[Pls.' Ex. No. 21.]

The juxtaposition of alleged facts, stating numerous times that Mark Thatcher and Wallace were business partners in a number of ventures, interspersed with numerous allegations that Mark Thatcher was involved in arms dealings and attempted to overthrow the government of Equatorial Guinea, while omitting key facts—specifically, that Wallace himself has not specifically been accused of selling weapons or attempting coups—leads this Court to conclude that a person of ordinary intelligence would impute allegations of arms dealings and attempted coups to Wallace.  Therefore, allegations in the Blog concern Wallace and are defamatory.

(C)     Perry satisfies the actual malice standard

A defendant must act with actual malice if the defamatory statements are related to the official

conduct of the public official. *Foster*, 541 S.W.2d at 812 (quoting *Sullivan*, 376 U.S. at 279–80).

Here, the Blog insinuated—among other things—that Wallace was an arms dealer. [Finding of Fact

No. 76.] This Court finds that acting as an arms dealer relates to one's position as a public official

because it impugns the official's loyalty, integrity, and morality.[43] Therefore, the Court will apply the

actual malice defamation standard to the publication of the Blog.

In this instance, Perry satisfies the actual malice standard, which requires that Perry act "with

reckless disregard as to [the] truth or falsity" of the defamatory publication. *Bentley*, 94 S.W.3d at

600. Here, Perry made no serious attempt to verify the information on the Blog. [Finding of Fact No.

73.] He asserts that he sent the website to his attorneys to investigate, but failed to provide any

evidence to corroborate this testimony; [Finding of Fact No. 76]; the Court finds that his testimony

on this point is wholly unreliable. Moreover, Perry's e-mail to Hoffman in which he stated that

Wallace could "kiss his political career goodbye" and that Perry has "them by there [sic] balls" further

evidences the fact that Perry knew the Blog contained false statements. [Finding of Fact No. 62.]

Further, Prestage, the Fort Bend County Commissioner, testified that in a telephone conversation,

Perry threatened him by saying: "[d]on't f--- with me, I will destroy you like I did David Wallace."

[Finding of Fact No. 45.] Perry was unhappy with both how the Partnership was being run and how

Bajjali and Wallace treated him. Moreover, Perry told Kaleta that Wallace's career in politics was

---

[43] Indeed, at a recent sentencing hearing for a convicted arms dealer, the Honorable Jed. S. Rakoff, United States District Judge for the Southern District of New York, noted that it was "a tragedy that [the arms dealer] has spent so much of his life in activities that certainly were not calculated to advance the human race." Benjamin Weiser, *An Arms Dealer is Sentenced to 30 Years in a Scheme to Sell Weapons to Terrorists*, N.Y. Times, Feb. 24, 2009, at A25.

over. [Finding of Fact No. 72.]  The e-mail to Hoffman, the threat to Prestage, and the comment to Kaleta provide this Court with more than sufficient evidence to conclude that when Perry published the Blog, he acted with actual malice or, alternatively, with reckless disregard of the truth.  Therefore, this Court concludes that Perry committed defamation in publishing the Blog to certain individuals.[44]

ii.    <em>Kickbacks</em>

(A)    Perry published the defamatory statements

Perry admitted that he published the "kickback" statements to the Shahs through e-mail. Further, Perry admitted to communicating the "kickback" statements to Arora, Tielke, and Hoffman.  [Finding of Fact No. 47.]  Therefore, Perry published the "kickback" statements, thus satisfying a necessary element for a defamation cause of action.

(B)    Perry satisfies the actual malice standard in relation to Wallace

In Perry's testimony, he admitted that he accused Wallace of receiving kickbacks.  [Finding of Fact No. 47.]  Accusing a public official of receiving kickbacks relates to his public office because it impugns the integrity of that public official.  Accordingly, this Court will apply the actual malice standard when determining whether Perry committed defamation when he accused Wallace of receiving kickbacks.

Here, Perry asserted that the only reason he accused Wallace of receiving kickbacks was due to the fact that when he asked for accounting records relating to a tenant improvement buildout, either

---

[44]  This Court finds that Wallace unequivocally disproved the allegations in the Blog.  Wallace convincingly testified that he was never involved in any arms dealings, nor was he aware of any arms dealings of Thatcher. [Finding of Fact No. 14.]  Wallace also convincingly testified that he was never involved in a plan to overthrow the government of Equatorial Guinea. [Finding of Fact No. 15.]  Therefore, the Court concludes that Wallace proved that the allegations in the Blog were completely false.