he was not provided them, or the records did not exist. [Finding of Fact. No. 47.] Perry admitted in his testimony that he had no evidence to substantiate his suspicion that Wallace was receiving kickbacks. [Finding of Fact No. 95.] Moreover, Perry made no attempt to investigate his suspicions before telling others that Wallace was receiving kickbacks. [Finding of Fact Nos. 47 & 95.] Further, the reasons set forth in the defamation analysis *supra*, regarding Perry's email to Hoffman and Perry's statement to Prestage, also apply here. Therefore, this Court concludes that Perry acted with actual malice in informing others that Wallace received kickbacks. Thus, Perry committed defamation when he published statements that Wallace received kickbacks.[45]

> (C)    Perry satisfies the negligence standard in relation to Bajjali

The allegation that Bajjali was receiving kickbacks was directed at Bajjali, a private individual, and did not concern a matter of public importance. When a defamatory statement is made regarding a matter of private concern, "the person cannot recover unless the publisher of the alleged libel knew or should have known the statement was false." *Lomas Bank USA v. Flatow*, 88 S.W.2d 52, 54 (Tex. App.—San Antonio 1994, writ denied).

Here, Perry was negligent in making the statement that Bajjali received kickbacks. Perry's only reason for making the statement was that he was lacking certain accounting records, specifically, records relating to a tenant improvement buildout. [Finding of Fact No. 47.] Further, as explained *supra*, Perry made no effort to investigate his allegation. Therefore, this Court concludes that Perry was negligent in publishing the statement that Bajjali received kickbacks. Thus, Perry committed defamation when he published the statement that Bajjali was receiving kickbacks, thereby satisfying

---

[45]   This Court also finds Perry's accusations that Wallace received kickbacks to be patently false. [Finding of Fact No. 95.] Once again, this Court finds Perry's testimony to lack any credibility.

a necessary element for a defamation cause of action.[46]

### iii.    *Fraud Allegations*

#### (A)    Perry published the defamatory statements

Perry sent an e-mail to McGrath in which he asserted that Wallace and Bajjali were trying to "extort more money," had committed "gross fraud," and had committed "serious crimes." [Finding of Fact No. 65.] McGrath testified that he received approximately multiple text messages from Perry which accused Wallace and Bajjali of similar allegations. [Finding of Fact No. 65.] McGrath, however, could not recall the exact content of the text messages. [Finding of Fact No. 65.] As discussed *supra*, sending an e-mail constitutes publication for defamation purposes. Further, McGrath's testimony and the language in the e-mail establishes that Perry made accusations against Wallace and Bajjali, accusing them of extortion, fraud, and other serious crimes. [Finding of Fact No. 65.] Moreover, Perry repeatedly expressed to Lunsford and Frishberg that Wallace was an incompetent businessman, had illegally transferred funds to himself, and had forged checks. [Finding of Facts Nos. 48 & 50.] Therefore, Perry published the defamatory statements, thus satisfying a necessary element for a defamation action.

#### (B)    Perry satisfies the actual malice standard in relation to Wallace

Accusing a public official of fraud, extortion, and other serious crimes impugns the integrity of that specific public official. As such, the defamatory statements relate to the public official's office, and thus must be analyzed pursuant to the actual malice standard for defamation.

---

[46] Further, the accusation that Bajjali received kickbacks is completely false. Bajjali convincingly testified that he has never been charged or convicted of a crime. [Finding of Fact No. 22.] Indeed, Bajjali unequivocally and very credibly testified that he has never been investigated for any alleged criminal activity. [Finding of Fact No. 22.]

Perry asserted at trial that he believed Wallace had committed extortion, gross fraud, and other serious crimes. Yet, Perry provided no credible evidence upon which to support his belief. This Court finds that no reasonable person would conclude that extortion, gross fraud, or other serious crimes had been committed based upon the testimony given by Perry at trial. Further, this Court's discussion of Perry's e-mail to Hoffman, Perry's statement to Kaleta, and Perry's conversation with Prestage—discussed *supra*—unequivocally establish that Perry acted with actual malice in the publication of the defamatory statements. Therefore, this Court concludes that Perry acted with actual malice when he e-mailed and texted McGrath the defamatory statements. Accordingly, Perry committed defamation against Wallace.

       (C)     Perry satisfies the negligence standard in relation to Bajjali

At trial, Perry introduced no credible evidence to justify his accusations against Bajjali. This Court concludes that a reasonably prudent person would not assume extortion, gross fraud, or serious crimes had been committed based upon the evidence presented at trial. Therefore, because Perry failed to adequately investigate his suspicion and did not act as a reasonably prudent person, he acted negligently when he published the statement that Bajjali committed extortion, gross fraud, or other serious crimes. Thus, Perry defamed Bajjali.

       *d.*     *Defamation per se*

For a published false statement to qualify as defamation *per se* in Texas, the statement must "unambiguously and falsely impute[] criminal conduct to [the] plaintiff." *Gray v. HEB Food Store # 4*, 941 S.W.2d 327, 329 (Tex. App.—Corpus Christi 1997, writ denied). A statement may constitute defamation *per se* "if it injures a person in his office, profession, or occupation." *Knox v.*

*Taylor*, 992 S.W.2d 40, 50 (Tex. App.—Houston [14th Dist.] 1999, no pet.). "[S]tatements that are defamatory per se are actionable without proof of injury." *Tex. Disposal*, 219 S.W.3d at 580 (citing *Bentley*, 94 S.W.3d at 604).

Here, Perry committed defamation *per se* in relation to all defamation actions. First, the Blog wrongly imputes criminal conduct to Wallace. Second, allegations of kickbacks, fraud, and other serious crimes impute criminal conduct to both Wallace and Bajjali. Third, all of the defamation actions injure Wallace and Bajjali in their office, occupation, or professional capacity. Therefore, this Court concludes that all of the defamation actions constitute defamation *per se*.

### e.   *Defamation Damages*

Where defamation has occurred, this Court must determine actual damages. "Actual damages are divided into general (direct) and special (consequential) damages." *Fox v. Parker*, 98 S.W.3d 713, 726 (Tex. App.—Waco 2003, pet. denied) (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997)) (internal quotation marks omitted). Moreover, "[u]nder Texas law, courts of equity have the power to assess exemplary damages." *Franklin Bank, S.S.B. v. Barnes (In re Barnes)*, 369 B.R. 298, 311 (Bankr. W.D. Tex. 2007) (citing *Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 115 (Bankr. N.D. Tex. 1999)). The Court now discusses these damages in turn as they apply to this lawsuit.

### i.   *General Damages*

Courts define general damages as "those conclusively presumed as a matter of law to have been foreseen by the defendant as a necessary and usual result of the defendant's wrongful act." *Id.* Indeed, they do not have to be specifically pled. *Id.* (citing *Green v. Allied Interests, Inc.*, 963 S.W.2d 205, 208 (Tex. App.—Austin 1998, pet. denied)). Where the court finds defamation *per se*, "the law

presumes that a person's reputation has been injured thereby," and allows the injured party to "recover general damages, such as for mental anguish, without proof of injury." *Id.* (citing *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984)) (internal quotation marks omitted). Moreover, the injured party does not have to prove proximate cause for general damages. *Id.* Where damages are presumed, however, the extent of the harm must be proven to recover more than nominal damages. *See Tex. Disposal*, 219 S.W.3d at 584 ("Although the amount of actual general damages remains a question for the jury . . . the plaintiff is entitled to an award of at least one dollar in nominal damages."); *Denton Publ'g Co. v. Boyd*, 448 S.W.2d 145, 147 (Tex. Civ. App.—Fort Worth 1969), *aff'd*, 460 S.W.2d 881 (Tex. 1970) (concluding that, at the very least, nominal damages should be awarded).

The amount of general damages suffered in a defamation case is difficult to determine and is generally left to the discretion to the finder of fact, subject only to a determination that the award was clearly excessive or the result of "passion, prejudice, or other improper influences." *Morrill v. Cisek*, 226 S.W.3d 545, 549 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Bolling v. Baker*, 671 S.W.2d 559, 571 (Tex. App.—San Antonio 1984, writ dism'd w.o.j.)); *see also Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 922 (Tex. App.—Corpus Christi 1991, writ dism'd w.o.j.). Even when the victim is a public official, general damages may be inferred from statements that are defamatory *per se*. *See Bentley*, 94 S.W.3d at 604; *Tex. Disposal*, 218 S.W.3d at 575.

Because Perry committed defamation *per se*, general damages, such as mental anguish damages, may be presumed. *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (concluding that mental anguish damages are general damages). Specific testimony implied mental anguish; for example, when McGrath heard the

allegations regarding Wallace, he resigned as the trustee of the Wallace Trusts' and has since refused to do business with Wallace or Bajjali. [Finding of Fact Nos. 81.] Furthermore, Perry caused e-mails about Wallace's alleged conduct to be sent to many of Wallace's business associates, which resulted in strained relations between Wallace and the Shahs. [Finding of Fact No. 82.] Additionally, Wallace's political career was heavily damaged by Perry's defamatory publication. [Finding of Fact No. 83.] Moreover, Wallace's relationship with his wife and his daughters has suffered due to the defamatory statements levied against him. [Finding of Fact No. 83.] Wallace suffered mental anguish and a diminished reputation, as well as damage to his political career, qualifying him for more than mere nominal general damages. Bajjali suffered damage to his business reputation. Accordingly, both Wallace and Bajjali are entitled to more than mere nominal damages.

As noted previously, the amount of general damages for defamation is left to the wide discretion of this Court. *Morrill*, 226 S.W.3d at 549. The Court awards differing amounts of general damages to Bajjali and Wallace for the reasons set forth herein. Perry falsely accused Bajjali of receiving kickbacks and committing extortion, gross fraud, and serious crimes. Perry falsely accused Wallace of these same bad acts, but, in addition, published the Blog (which implied that Wallace, among other things, was an arms dealer and that he attempted to overthrow the government of Equatorial Guinea). [Finding of Fact Nos. 15 & 76.] Because Perry falsely accused Wallace of more bad acts than Bajjali, the Court concludes that Wallace should be awarded a greater amount of general damages for defamation. The Court concludes that Bajjali is entitled to $10,000.00 for each category of false accusation made against him. Thus, he is entitled to $40,000.00 because Perry accused him of: (1) receiving kickbacks; (2) committing extortion; (3) committing gross fraud; and (4) committing serious crimes. The Court further concludes that Wallace is entitled to $10,000.00 for each category

of false accusation against him. Thus, he is entitled to $60,000.00 because Perry accused him of: (1) receiving kickbacks; (2) committing extortion; (3) committing gross fraud; and (4) committing serious crimes. Additionally, Perry published the Blog, which insinuated that Wallace was an arms dealer; and attempted to overthrow the government of Equatorial Guinea.[47]

### ii.     Special Damages

Damages that do not fall under the category of general damages are considered special—i.e., consequential—"which must be foreseeable to the defendant but are not the necessary and usual result of the wrong." *Fox*, 98 S.W.3d at 726 (citing *Arthur Andersen*, 945 S.W.2d at 816)). As discussed *supra*, special damages must be specifically pleaded.

Here, the Plaintiffs' complaint merely states that "Plaintiffs suffered damages because of Debtor's actions . . . Plaintiffs seek a judgment for [a]ctual damages." [Adv. Docket No. 1, ¶ 51.] Accordingly, the pleadings fail to give fair notice of any special damages being asserted against Perry. Therefore, the Court will not award special damages.

### iii.     Punitive or Exemplary Damages

Bankruptcy courts are considered courts of equity by the Supreme Court. *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990). Moreover, "[u]nder Texas law, courts of equity have the power to assess exemplary damages." *Franklin Bank*, 369 B.R. at 311(citing *Mims* 239 B.R. at 115 (Bankr. N.D. Tex. 1999)). Although 11 U.S.C. 523(a)(6) does not provide for exemplary damages, "[a] bankruptcy court may rely on state law to award exemplary damages where the Code does not

---

[47]   Wallace had a business relationship with Mark Thatcher, the son of the thrice-elected Prime Minister of England, Lady Margaret Thatcher. As the son of the British Prime Minister, it is not implausible that one could be led to believe that he has international contacts who have the capability of attempting to overthrow the government of Equatorial Guinea. Therefore, it is also not implausible that one could be led to believe that Wallace had some involvement in attempting to overthrow this government.

specifically allow such measures." *Smith v. Lounsbury (In re Amberjack Interests, Inc.)*, 326 B.R. 379, 391 (Bankr S.D. Tex. 2005) (citing *In re Landbank Equity Corp.*, 83 B.R. 362, 382 (E.D. Va. 1987)); *see also In re A.G. Fin. Serv. Ctr., Inc.*, 395 F.3d 410, 414 (7th Cir. 2005).

For a defamation claim, statements made with "malice raises . . . conduct to that type of egregiousness that justifies punitive damages." *Peshak v. Greer*, 13 S.W.3d 421, 426 (Tex. App.—Corpus Christi 2000, no pet.). In this context, malice is defined as a "specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7). Moreover, "[s]pecific intent means that the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." *Franklin Bank*, 369 B.R. at 311 (quoting *Mission Resources, Inc. v. Garza Energy Trust*, 166 S.W.3d 301, 313 (Tex. App.—Corpus Christi 2005), *rev'd on other grounds*, 268 S.W.3d 1 (Tex. 2008)) (internal quotation marks omitted). Malice may be proved through either direct or circumstantial evidence. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994). Thus, if a plaintiff proves that the defendant's defamatory statements were made with malice by clear and convincing evidence, a court may impose punitive or exemplary damages. *Bentley*, 94 S.W.3d at 596–97 ("[E]vidence is clear and convincing if it supports a firm conviction that the fact[s] to be proved [are] true.") (citing *Huckabee* 19 S.W.3d at 422).

Here, the Plaintiffs have shown by clear and convincing evidence that Perry clearly published the defamatory statements against Wallace and Bajjali with a malicious intent to injure the reputations of his former colleagues, as described herein. [Finding of Fact Nos. 41, 45, 48–56, 65, 75, 80 & 93.] Even Bob Perry, Perry's own father, described his son's behavior as "ugly," testifying that "whoever put those words down on paper, it's ugly." [Finding of Fact No. 63]; [Pls.' Ex. No. 30.] This Court

finds that Perry desired to cause the consequences of his acts, and concludes that Perry maliciously defamed Wallace and Bajjali. Therefore, this Court will impose punitive damages on Perry for his defamatory statements.

Exemplary damages must be reasonably proportioned to actual damages in order to be recovered. *Sw. Inv. Co. v. Neely*, 452 S.W.2d 705, 707 (Tex. 1970) (citing *Fort Worth Elevators Co. v. Russell*, 70 S.W.2d 397, 409 (Tex. 1934)). When assessing punitive damages, courts should take into account the following factors: "(1) the nature of the wrongdoing, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety." *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 925 (Tex. 1998); *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981) (quoting *First Sec. Bank & Trust Co. v. Roach*, 493 S.W.2d 612, 619 (Tex. Civ. App.—Dallas 1973, writ ref'd n.r.e.)); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 41.011 (requiring trial courts to discuss the *Kraus* factors when determining the amount of exemplary damages). The Court now applies these five factors in order to determine the amount of punitive damages to which Bajjali is entitled and to which Wallace is entitled.

(A)     Determination of Bajjali's Punitive Damages

(i)     Nature of Wrongdoing

The first factor a trial court should take into account when determining the amount of a punitive damage award is the nature of the wrongdoing. *Mobil Oil Corp*, 968 S.W.2d at 925. Here, Perry asserted in an e-mail that Bajjali had committed extortion, gross fraud, and other serious crimes. [Finding of Fact No. 65.] Further, Further, Perry communicated to a number of people—the Shahs, Hoffman, Tielke, and Arora—that Bajjali was receiving kickbacks. [Finding of Fact No. 47.]

89

Accordingly, this factor heavily weighs in favor of awarding some amount of punitive damages to Bajjali.

(ii)     Character of Conduct

The second factor a trial court should take into account in determining the amount of a punitive damage award is the character of the conduct involved. *Id.* Here, Perry sent a some e-mails to one person—McGrath—asserting that Bajjali had committed extortion, gross fraud, and other serious crimes. [Finding of Fact No. 65.] Further, Perry communicated to a number of people—the Shahs, Hoffman, Tielke, and Arora—that Bajjali was receiving kickbacks. [Finding of Fact No. 47.] Accordingly, this factor also heavily weighs in favor of awarding some amount of punitive damages to Bajjali.

(iii)     Degree of Culpability

The third factor that a trial court should take into account when determining the amount of a punitive damage award is the degree of culpability of the wrongdoer. *Id.* Here, Perry is solely responsible for disseminating the defamatory statements about Bajjali. [Finding of Fact No. 65.] Accordingly, this factor heavily weighs in favor of awarding some amount of punitive damages to Bajjali.

(iv)     Situation and Sensibility of the Parties

The fourth factor that a trial court should take into account when determining the amount of a punitive damage award is the situation and sensibilities of the parties concerned. *Id.* Here, Perry sent an e-mail impugning Bajjali's business reputation, as well as accusing him of committing a crime. [Finding of Fact No. 65.] Perry then sent this e-mail to McGrath, a sophisticated businessman in the greater Houston area. [Finding of Fact No. 18.] McGrath has has the capacity to

90

further tarnish Bajjali's reputation by innocently communicating the contents of the e-mail to third-parties within the business community. However, Bajjali is still a partner in the Wallace-Bajjali partnership, and appears to be able to pursue his career in real estate despite Perry's defamatory communications. [Finding of Fact No. 78.] Moreover, unlike Wallace, there has not been any evidence introduced that Bajjali's family life was negatively affected by Perry's defamatory statements. Under these circumstances, this fourth factor moderately weighs in favor of awarding some amount of punitive damages to Bajjali.

(v)    Extent of Offense to Public Sense of Justice and Propriety

The fifth factor that a trial court should take into account when determining the amount of a punitive damage award is the extent to which the conduct offends the public's sense of justice and propriety. *Id.* Here, Perry accused Bajjali of a "white-collar" illegalities, [Finding of Fact No. 65], as opposed to crimes that foment violence. The Court by no means intends to convey any message that it condones Perry's conduct; rather, the Court intends only to convey that Perry's bad conduct, while offensive to the public's sense of justice and propriety, is not as offensive as would have been the case if he had accused Bajjali of violent crimes.[48] Accordingly, this fifth factor moderately weighs in favor of awarding some amount of punitive damages to Bajjali.

Taking all of the aforementioned factors into account—with the first three factors weighing heavily in favor and the last two factors weighing moderately in favor of awarding punitive damages—this Court concludes that an award of $25,000.00 in punitive damages to Bajjali in relation

---

[48] At trial, Perry testified that he felt physically threatened at the Partnership's offices by Bajjali when the two of them were still partners. [Finding of Fact No. 31.] Aside from the fact that this Court does not find Perry to be credible in this testimony, Perry never published his feelings or told third-parties that Bajjali was physically threatening him. Therefore, Perry never accused Bajjali of committing a crime of violence.

91

to his defamation cause of action is a reasonable award

        (B)     Determination of Wallace's Punitive Damages

           (i)     Nature of Wrongdoing

As noted already above, the first factor a trial court should take into account when determining the amount of a punitive damage award is the nature of the wrongdoing. *Id.* Here, Perry asserted in an e-mail that Wallace had committed extortion, gross fraud, and other serious crimes. [Finding of Fact No. 65.] Further, Perry disseminated the Blog, which contained, among other things, false insinuations that Wallace was an arms dealer and was in league with Mark Thatcher in attempting to overthrow the government of Equatorial Guinea. [Finding of Fact Nos. 75 & 76.] Moreover, Perry communicated to a number of people—the Shahs, Hoffman, Tielke, and Arora—that Wallace was receiving kickbacks. [Finding of Fact No. 47.] Accordingly, this factor heavily weighs in favor of awarding some amount of punitive damages to Wallace.

           (ii)     Character of Conduct

The second factor a trial court should take into account in determining the amount of a punitive damage award is the character of the conduct involved. *Id.* Here, Perry sent some e-mails to one person—McGrath—asserting that Wallace had committed extortion, gross fraud, and other serious crimes. [Finding of Fact No. 65.] But there is more. Perry disseminated the Blog, which contained, among other things, false insinuations that Wallace was an arms dealer and was in league with Mark Thatcher in attempting to overthrow the government of Equatorial Guinea. [Finding of Fact Nos. 75 & 76.] Moreover, Perry communicated to a number of people—the Shahs, Hoffman, Tielke, and Arora—that Wallace was receiving kickbacks. [Finding of Fact No. 47.] These multiple acts underscore Perry's intent to destroy Wallace's business and political reputation and career; stated

differently, Perry's conduct toward Wallace can be characterized as despicable. Accordingly, this factor also heavily weighs in favor of awarding some amount of punitive damages to Wallace.

(iii)   Degree of Culpability

The third factor that a trial court should take into account when determining the amount of a punitive damage award is the degree of culpability of the wrongdoer. *Id.* Here, Perry is solely responsible for disseminating the e-mail to McGrath accusing Wallace of committing fraud, extortion and other crimes, as well as communications to several people stating that Wallace received kickbacks. [Finding of Fact Nos. 47 & 65.] And, although Perry did not create the Blog, he—and he alone—ensured that the Blog was circulated to numerous individuals by instructing Hoffman, his administrative assistant and confidant, to take the necessary action to disseminate the Blog. [Finding of Fact No. 75.] Indeed, Perry had Hoffman undertake this act because he himself wanted to remain anonymous, i.e., he did not want anyone other than Hoffman to know that he was behind the distribution of the Blog. [Finding of Fact No. 75.] Under all of these circumstances, this factor heavily weighs in favor of awarding some amount of punitive damages to Wallace

(iv)   Situation and Sensibility of the Parties

The fourth factor that a trial court should take into account when determining the amount of a punitive damage award is the situation and sensibilities of the parties concerned. *Id.* Here, Perry sent an e-mail impugning Wallace's business reputation, as well as accusing him of committing a crime. [Finding of Fact No. 65.] Perry then sent this e-mail to McGrath,   a sophisticated businessman in the greater Houston area. [Finding of Fact No. 18.] McGrath has the capacity to further tarnish Wallace's reputation by innocently communicating the contents of the e-mail to third-parties within the business community. Moreover, McGrath stopped participating in any business

93

transactions with Wallace, and McGrath also resigned as trustee of the Wallace Trusts. [Finding of Fact No. 81.]   Thus, Perry's actions are even more sensitive toward Wallace than Bajjali because Wallace's family life was negatively affected: the trustee of his daughters' trusts resigned; indeed, Wallace's ability to be a role model to his own daughters has been eroded.   [Finding of Fact No. 83.] However, Wallace is still a partner in the Wallace-Bajjali partnership, and appears to be able to pursue his career in real estate despite Perry's defamatory communications. [Finding of Fact No. 78.]   In this one respect, Wallace, like Bajjali, has a business career that is at least still intact, if not totally stellar.

However, unlike Bajjali, who was never in politics, Wallace's political career has been severely damaged due to Perry's defamatory communications.   Not only did he fail to prevail in the Republican primary for Congressional District Number 22 despite having been the Mayor of Sugar Land, [Finding of Fact No. 69], his invitation to speak at the Gathering of Men was withdrawn, and the organizers of the Lincoln-Reagan Dinner not only returned Wallace's contribution to him, but declined to ask him to introduce the guest speaker at this event as he had done in the prior four years. [Finding of Fact No. 83.]   Under all of these circumstances, this fourth factor very heavily weighs in favor of awarding some amount of punitive damages to Wallace.

> (v)   Extent of Offense to Public Sense of Justice
> and Propriety

The fifth factor that a trial court should take into account when determining the amount of a punitive damage award is the extent to which the conduct offends the public's sense of justice and propriety.  *Id.*  Here, Perry disseminated false statements about Wallace accusing him not only of "white-collar" illegalities,  [Finding of Fact No. 65], but also accusing him of crimes that foment violence, i.e., arms dealing and working with Mark Thatcher to overthrow the Government of

94

Equitorial Guinea. [Finding of Fact Nos. 75 & 76.]  Thus, unlike Perry's accusations toward Bajjali—which solely accused Bajjali of "white collar" crimes—Perry's accusations relating to Wallace covered the gamut.  Accordingly, this fifth factor strongly weighs in favor of awarding some amount of punitive damages to Wallace.

Taking all of the aforementioned factors into account—with all five factors weighing heavily in favor of awarding punitive damages—this Court concludes that an award of $100,000.00 in punitive damages to Wallace in relation to his defamation cause of action is a reasonable award.

The Court's defamation damage awards (both general and punitive) fall well within the bounds of defamation awards given by Texas state courts.  *See, e.g.*, S&T Aircraft Accessories v. Bonnington, No. 03-98-00648-CV, 2000 WL 13104, at *10 (Tex. App.—Austin, Jan. 06, 2000, pet. dism'd w.o.j.) (affirming compensatory damages for slander against two separate defendants for a total of $105,000.00); *Bolling v. Baker*. 671 S.W.2d 559, 569, 571 (Tex. App.—San Antonio 1984, no writ) (affirming a jury award of $64,000.00 in actual damages and $60,000.00 in punitive damages).  Here, this Court is awarding more defamation damages to Wallace than to Bajjali because Wallace had more defamatory remarks published regarding him and suffered greater damage to his reputation.  Indeed, Wallace's political career was effectively destroyed by Perry. [Finding of Fact Nos. 69 & 83.]  Moreover, juries award higher damages when a professional's reputation—here, Wallace's political reputation—was significantly harmed.  *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 918, 927 (Tex. App.—Corpus Christi 1991, writ dism'd w.o.j.) (affirming a jury award stemming from a slander cause of action for $212,875.00 in reputation damages, $84,525.00 in past lost earnings, $19,791.66 in mental anguish damages, and $1,000,000.00 in exemplary damages); *Pruitt v. Ziesmer*, No. 14-00-00054-CV, 2002 Tex. App. LEXIS 4333, at *1 (Tex.

App.—Houston [14th Dist.] June 13, 2002, no pet. h.) (affirming a jury award of $570,000.00 in actual damages and $350,000.00 in exemplary damages when an arson investigator's business reputation was slandered, resulting in harm to his career), *appeal dismissed per stipulation*, No. 14-00-00054-CV, 2002 Tex. App. LEXIS 6591, at *1–2 (Tex. App.—Houston [14th Dist.] Sept. 5, 2002, no pet. h.) (withdrawing the opinion after the parties settled the dispute).

iv.  *Attorneys' Fees*

The Plaintiffs are not eligible for attorneys' fees in relation to the defamation actions. "Attorney's fees are available when a statute or contract permits such an award." *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 584 (Tex. App.—Austin 2003, no pet.). The Texas attorneys' fees statute does not include defamation, or any tort for that matter. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001. Therefore, this Court may not award attorneys' fees in relation to the defamation causes of action.

In sum, this Court will award the following defamation damages: (1) to Bajjali, $25,000.00 in actual damages and $25,000.00 in punitive damages; and (2) to Wallace, $100,000.00 in actual damages and $100,000.00 in punitive damages.

f.  *The Defamation Claims and Non-dischargeability Under 11 U.S.C. § 523(a)(6)*

Perry evidenced his willful and malicious intent to injure Wallace and Bajjali pursuant to the § 523(a)(6) analysis *supra*. For example, Prestage testified that Perry, in a fit of rage, threatened him by saying "[d]on't you f--- with me, I will destroy you like I did David Wallace." [Finding of Fact No. 45.] Moreover, Perry's e-mail stating that "[t]he master is at work I have them by there balls" is further evidence of Perry's malicious intent. [Finding of Fact Nos. 58 & 62.] In another e-mail sent

96

to Hoffman, Perry stated "the ball has started rolling now cannot stop it about dave." [Finding of Fact

No. 64.]  In yet another communication evidencing his desire to harm Wallace and Bajjali, Perry

stated "[Wallace] can kiss his political career goodbye." [Finding of Fact No. 62.]  Finally, Kaleta

testified that during a lunch meeting, Perry described his plot to serve Wallace with a lawsuit while

Wallace was in chambers at Sugar Land City Hall because the publicity would destroy Wallace's

career.  [Finding of Fact. No. 93.]

This Court concludes that the actions described *supra*, and throughout this opinion, satisfy the

willful and malicious requirement of 11 U.S.C. § 523(a)(6) because Perry's acts evidence a subjective

motive to cause harm or, in the alternative, his actions had an objective substantial certainty of harm.

*In re Miller*, 156 F.3d at 606.   Accordingly, any damages stemming from defamation are non-

dischargeable as to Wallace and Bajjali.

### 3.    *Fraud and Fraudulent Inducement Claims*

The Plaintiffs assert that they were fraudulently induced into executing the Purchase

Agreement and that Perry never intended to honor the obligations of the Purchase Agreement.  The

Plaintiffs argue that Perry had no intention of honoring his contractual obligations at the time he

signed the Purchase Agreement. Perry, however, asserts that (1) Texas contract law bars the Plaintiffs

from claiming fraud; and (2) even if the claim for fraud is valid, he intended to honor his contractual

obligations.

#### a.    *Texas Contract Law Does Not Bar the Plaintiffs' Fraudulent Inducement or Fraud Claims*

Perry asserts that the fraud and fraudulent inducement claims are barred for two

independent reasons: (1) the merger clause in section 9.8 of the Purchase Agreement bars the claims;

and (2) the failure to perform contractual obligations is a breach of contract, not a tort.

i.      *The Merger Clause*

The merger clause in section 9.8 of the Purchase Agreement does not bar an action for fraud because it does not anticipate a release of any claims. In order for a merger clause in a contract to bar a fraud claim, the parties must have bargained for and anticipated a release of future fraud claims. *See Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003). The court in *Armstrong*, however, noted that "a fraud claim can be negated where a merger clause evinces a party's clear and unequivocal expression of intent to disclaim reliance on specific representations." *Id.* (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997)). Indeed, in each case Perry cites in support of his proposition, the merger clauses negated the fraud claims because the parties clearly and unequivocally bargained for and anticipated that the clause would negate any future fraud claims. *See Schlumberger*, 959 S.W.2d at 181; *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 869 (Tex. App.—Austin 2006, pet. granted, remanded by agr.); *Armstrong*, 333 F.3d at 571.

Here, there is no evidence that either party intended to release any party for liability for fraud or fraudulent inducement. The merger clause merely states that "this agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the subject matter within." [Pls.' Ex. No. 4, § 9.8.] There is no language in the merger clause that contemplates a release of any claim arising out of the Purchase Agreement itself. Thus, this Court concludes that the Purchase Agreement's merger clause does not negate fraud or fraudulent inducement causes of action.

ii.     *Contract and Tort Elements*

The Plaintiffs' causes of action for fraud and fraudulent inducement are not barred simply because the Plaintiffs base their actions on evidence that Perry never intended to honor his contractual obligations. The Texas Supreme Court has held that failure to perform the terms of a contract, by itself, is not evidence of fraud. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). Moreover, where the only evidence of misrepresentation is the terms of the contracts themselves, there is no evidence of an actual misrepresentation. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 596 (Tex. 1992).

Perry asserts that fraud may not be raised where there is merely a breach of contract and an absence of evidence showing fraud. Although Perry correctly states the law regarding actions for fraud in relationship to a breach of contract, the Plaintiffs introduced sufficient evidence showing some elements of fraud on the part of Perry beyond the terms of the Purchase Agreement. Specifically, the "trick" e-mail provides additional evidence of fraud. [Finding of Fact Nos. 58 & 59.] Therefore, fraud and fraudulent inducement causes of action are not barred, as there is some evidence of fraud aside from a mere breach of contract.

b.     *Merits of the Fraud Claims*

Despite not being barred as a matter of law, the Plaintiffs' fraud claims fail because Perry intended to honor his contractual obligations at the time the contract was entered into. "A fraud cause of action requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa*, 960 S.W.2d at 47 (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994)) (internal quotation marks omitted).

A fraud cause of action may be based upon a promise of future performance that a defendant never intended to honor. *Id.* at 48. Failure to perform must be coupled with a finding of a lack of intention to perform the contract at the time of formation. *Id.* The Plaintiffs have failed to prove Perry's intent not to perform the Purchase Agreement at the time of formation.

i.   *Lack of Evidence*

The Plaintiffs have not sufficiently proven that Perry had no intention of performing the Purchase Agreement at the time of formation. Proof that a defendant breached an agreement, on its own, is insufficient to show that a defendant had no intention of performance. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). Moreover, evidence that a misrepresentation was made with no intent to perform must be relevant to a defendant's "intent at the time the representation was made." *Formosa*, 960 S.W.2d at 48 (citing *Sporljaric*, 708 S.W.2d at 434).

The Plaintiffs' evidence of Perry's lack of intent is, aside from general hostility from Perry toward Wallace and Bajjali., the "trick" e-mail. Specifically, the "trick" e-mail states, among other things, the following: "They [Wallace and Bajjali] will walk away with nothing after this week and oh Dave [Wallace] can kiss his political career goodbye. Costa [Bajjali] will be getting all the blame plus a hell of a lot of debt." [Finding of Fact Nos. 58 & 62.] Perry's statements in the "trick" e-mail are too vague for a conclusion that Perry entered into the Purchase Agreement with no intention to perform. Indeed, not only does the "trick" e-mail fail to mention specific provisions of the Purchase Agreement that Perry allegedly did not intend to Perform, but the "trick" e-mail does not mention the Purchase Agreement whatsoever. [Finding of Fact No. 58.] The vague statements in the "trick" e-mail are insufficient for this Court to conclude that Bajjali and the Wallace Trusts were fraudulently induced into signing the Purchase Agreement. *See id.* (concluding that fraudulent inducement

100

occurred when, two weeks before the contract was signed, evidence was presented that showed the defendant intended to break a specific portion of the contract). Accordingly, this Court concludes that there is insufficient evidence to support a fraud or fraudulent inducement cause of action in relation to the Purchase Agreement.

ii.     <em>Substantial Performance as Evidence of Intent</em>

Perry substantially performed his obligations pursuant to the Purchase Agreement. In Texas, partial performance of an agreement refutes an assertion that there was no intent to perform. *See Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 445–46 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). Here, Perry substantially performed the obligations of the Purchase Agreement. In the suit at bar, among other things, Perry purchased—and paid for—the other Partnership interests for $450,000.00. [Finding of Fact No. 39.] His payment of $450,000.00 reflects Perry's intent to honor the obligations under the Purchase Agreement at the time of execution.

Moreover, Perry's subsequent breach is not adequate evidence of fraudulent inducement. A person commits fraud when he enters into a contract that he does not intend to perform; a person merely breaches a contract when he enters into that contract and later decides not to perform. *See Tony Gullo Motors I, LP v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006). Here, Perry performed, to a certain extent, the obligations under the Purchase Agreement and only later breached specific provisions. The breach of contract after partial performance shows that Perry intended to perform the contract in its entirety at the time he signed the Purchase Agreement

In sum, even though Texas law allows the Plaintiffs to allege fraud and fraudulent inducement, their specific claims are without merit because Perry intended to honor the obligations under the Purchase Agreement at the time he signed this contract. Although Perry ultimately breached the terms

101

of the Purchase Agreement, his lack of fraudulent intent at the time of contract formation precludes the Plaintiffs from recovering. Therefore, this Court will not award damages based upon a theory of fraud and fraudulent inducement.

### 4.    Breach of Fiduciary Duty Claim

In order to prevail on a breach of fiduciary duty cause of action, a plaintiff must show that: (1) there was a fiduciary relationship between the plaintiff and the defendant; (2) the defendant breached his fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)).

Partnerships formed after January 1, 2006, are governed by the Texas Business Organization Code (TBOC). TEX. BUS. ORGS. CODE § 402.001; *Ingram v. Deere*, 288 S.W.3d 886, 894 n.4 (Tex. 2009). The Texas Revised Partnership Act (TRPA) governs partnerships formed on or after January 1, 1994, but before January 1, 2006. Tex. Rev. Civ. Stat. art. 6132b § 11.03(a); *Ingram*, 228 S.W.3d at 894 n.4. Here, the Partnership was formed on October 22, 2004. [Finding of Fact No. 1.] Therefore, TRPA governs.

### a.    Perry Owed a Fiduciary Duty

The Texas Supreme Court has held that partners owe fiduciary duties to one another. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002) (citing *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex. 1998)). Partners also owe a fiduciary duty to the partnership. *See Frazier v. Havens*, 102 S.W.3d 406, 414 (Tex. App.—Houston [14th Dist.] 2003, no pet.). A fiduciary's duties encompass a duty of good faith and fair dealing and he must place the interests of the other party ahead of his own. *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st

102

Dist.] 2003, no pet.). These duties include a duty of loyalty and a duty of care. TEX. CIV. REV. STAT.

ANN. ART. 6132b § 4.04(a). "Texas courts have long held that '[i]t is axiomatic that a managing

partner in a general partnership, owes his co-partners the highest fiduciary duty recognized in the

law.'" *McBeth v. Carpenter*, 565 F.3d 171, 177 (5th Cir. 2009) (quoting *Crenshaw v. Swenson*, 611

S.W.2d 886, 890 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.)). Once a partnership dissolves,

however, "the duty is limited to matters relating to the winding up of the partnership's affairs." *M.R.*

*Champion, Inc. v. Mizell*, 904 S.W.2d 617, 618 (Tex. 1995).

Here, Perry and Bajjali initially formed Perry Properties in 2004. [Finding of Fact No. 1.]

Wallace was not personally named on the Partnership Agreement. [Pls.' Ex. No. 2.] Indeed, it was

the Wallace Trusts who were the other partners in Perry Properties. [Finding of Fact No. 2.] Because

the Purchase Agreement dissolved the Partnership, Perry owed a fiduciary duty to Bajjali and the

Wallace Trusts in the winding up process, but not to Wallace personally. *See Mizell*, 904 S.W.2d at

618.

        *b.     Perry Breached His Duties*

           *i.     Duty of Care*

Texas law requires partners to maintain a duty of care to the partnership and other partners,

stating:

> A partner's duty of care to the partnership and the other partners is to act in the
> conduct and winding up of the partnership business with the care an ordinarily prudent
> person would exercise in similar circumstances. An error in judgment does not by
> itself constitute a breach of this duty of care.

TEX. REV. CIV. STAT. ART. 6132b § 4.04(c). A partner fulfills this duty of care in the winding up of

the partnership if he "discharge[s] the partner's duties to the partnership and the other partners under

this Act or the partnership agreement . . . (1) in good faith; and (2) in a manner the partner reasonably believes to be in the best interest of the partnership. *Id.* § 4.04(d).

Perry breached his duty of care in relation to the winding up of the Partnership. This Court finds that Perry did not act with care an ordinarily prudent person would exercise. Perry failed to discharge Bajjali and the Wallace Trusts in good faith, pursuant to the Indemnification Clause. [Finding of Fact Nos. 99–106.] Therefore, this Court concludes that Perry breached his fiduciary duty of care in the winding up of the Partnership.

### ii.    Duty of Loyalty

A partner owes a duty of loyalty to other partners and the partnership. Tex. Rev. Civ. Stat. art. 6132b § 4.04(a). The duty of loyalty includes "refraining from . . . dealing with the partnership in a manner adverse to the partnership." *Id.* § 4.04(b).

Perry breached his duty of loyalty to the Partnership by adversely dealing with the Partnership. Perry would often refuse to attend meetings relating to the duties that Perry, the Wallace Trusts, and Bajjali owed to their investors. [Finding of Fact Nos. 29 & 41.] Although Perry knew the Partnership meetings were necessary to determine this entity's direction, he cancelled all meetings on September 9, 2006 without Wallace or Bajjali's consent. [Finding of Fact No.36.] Perry chose to go to the movies rather than fulfilling his duties to the Partnership. [Finding of Fact No. 29.] Because Perry dealt with the Partnership in an adverse manner, the Court concludes that Perry breached his duty of loyalty to the Partnership.

### c.    Damages

A plaintiff bears the burden of proof to show that a breach of fiduciary duty resulted in an "injury to the plaintiff or [a] benefit to the defendant." *e2 Creditors Trust v. Stephens, Inc. (In re e2*

*Commc'ns, Inc.*), 354 B.R. 368, 394 (Bankr. N.D. Tex. 2006). A plaintiff must also show that the defendant's breach of a fiduciary duty was the proximate cause of the injury suffered. *Id.*

### i.   Duty of Care

The damages for Perry's breach of his fiduciary duty of care stem from his failure to indemnify pursuant to the Indemnification Clause. Therefore, the damages analysis regarding the breach of the Indemnification Clause is applicable here. Thus, in the alternative, damages may be awarded for the cost of restructuring the various obligations of Perry Properties based on a breach of Perry's duty of care in the winding up of the Partnership.[49]

### ii.   Duty of Loyalty

The Court will not award damages based upon Perry's breach of his duty of loyalty. The Plaintiffs did not adequately introduce sufficient exhibits and adduce persuasive testimony showing that the Partnership or the partners suffered damages as a result of Perry's breach. Thus, no damages will be awarded.

### C.   Affirmative Defenses Asserted by Perry

This Court must look to the Federal Rules of Civil Procedure when addressing affirmative defenses. Fed. R. Bankr. P. 7008(c). Rule 8(c) states that parties must plead all affirmative defenses. Fed. R. Civ. P. 8(c). The Court will address the following affirmative defenses which Perry pleads.

---

[49]   Even if the Indemnification Clause did not exist, this Court would find the same amount of damages, i.e., the amount of damages for breach of the Indemnification Clause, for Bajjal under a theory of breach of fiduciary duties; however, no attorneys' fees would be awarded. Finally, the Court would not award damages to the Wallace Trusts for the same reasons set forth in the subsection discussing damages relating to the breach of the Indemnification Clause; namely, because Bajjali and the Wallace Trusts had both guaranteed the Flagship Loan and the Bank of Texas Loans, when the Wallace-Bajjali Partnership mitigated the damages by restructuring these two loans, the Wallace Trusts necessarily benefitted by such restructuring because they did not have to come out of pocket at all; only Bajjali had to come out of pocket (by using assets of the Wallace-Bajjali Partnership to achieve the restructuring).

### 1.   Clean Hands Doctrine

In the suit at bar, the affirmative defense of clean hands is inapplicable.   "The clean hands doctrine requires that one who seeks equity, does equity.  Equitable relief is not warranted when the plaintiff has engaged in unlawful or inequitable conduct with regard to the issue in dispute." *In re Francis*, 186 S.W.3d 534, 551 (Tex. 2006) (citing *Right to Life Advocates, Inc. v. Aaron Women's Clinic*, 737 S.W.2d 564, 571–72 (Tex. App.—Houston [14th Dist.] 1987, writ denied)).  A party asserting this defense must show that he, and not some third party, has been injured by the plaintiff's conduct. *Williams v. Robinson*, No. 12-08-00260-CV, 2009 Tex. App. LEXIS 5982, at *19 (Tex. App.—Tyler, July 31, 2009, no pet.) (quoting *Omohundro v. Matthews*, 341 S.W.2d 401, 410 (Tex. 1960)).  Further, the party asserting the defense of clean hands must come to court with clean hands. *Grohn v. Marquardt*, 657 S.W.2d 851, 855 (Tex. App.—San Antonio, 1983, writ ref'd n.r.e.) (citing *Munzenrieder & Assocs., Inc. v. Daigle*, 525 S.W.2d 288, 291 (Tex. Civ. App.—Beaumont 1975, no writ)).  Whether a party has come to court with clean hands is a determination left to the discretion of the trial court. *Id.*  (citing *Hand v. State*, 335 S.W.2d 410, 419 (Tex. Civ. App.—Houston 1960) *writ refused per curiam*, 337 S.W.2d 798 (1960)).

Perry—who happens to have filthy hands as already described herein—has introduced no exhibits, and adduced no testimony, showing that Wallace or Bajjali engaged in unlawful or inequitable conduct or that Perry has been injured as the result of the Plaintiffs' conduct. Accordingly, the affirmative defense of unclean hands does not absolve Perry of liability.

### 2.   Equitable Estoppel

Perry has failed to meet the burden of proof required for equitable estoppel.  Equitable estoppel is based on the principle that one who, by his conduct, has induced another to act in a

particular manner should not be permitted to adopt an inconsistent position and thereby cause loss

or injury to another. *See Ulico Cas. Co v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008).

Equitable estoppel is established when (1) a false representation or concealment of material facts, (2)

is made with knowledge—be it actual or constructive—of those facts, (3) with intention that it should

be acted upon, (4) to a party without knowledge or means of obtaining knowledge of the facts, (5)

who detrimentally relies on the representation. *Id.* (citing *Johnson & Higgins of Tex., Inc. v. Kenneco*

*Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998)); *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d

483, 489 (Tex. 1991); *Frank v. Bradshaw*, 920 S.W.2d 699, 701 (Tex. App.—Houston [1st Dist]

1996, no writ). The party asserting the defense of equitable estoppel has the burden of proving the

essential elements of estoppel, and "failure to prove any element is fatal." *Magnum v. Conrad*, 185

S.W.3d 602, 606 (Tex. App.—Dallas 2006, pet. denied) (citing *Adams v. First Nat'l Bank of*

*Bells/Savoy*, 154 S.W.3d 859, 876 (Tex. App.—Dallas 2005, no pet.)).

In the suit at bar, Perry has failed to provide this Court with any evidence that Plaintiffs made

false representations of material facts. Additionally, Perry has not shown any form of detrimental

reliance on any assertions made by the Plaintiffs. Perry's vague and unsubstantiated accusations do

not come within hailing distance of meeting the burden of proving all essential elements of estoppel.

Therefore, Perry's defense of equitable estoppel fails.

### 3.  Statute of Frauds

Perry asserts that the Plaintiffs' contractual causes of action are barred by the Statute of

Frauds. In Texas, "[a] promise or agreement is not enforceable unless the promise or agreement, or

a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise

or agreement or by someone lawfully authorized to sign for them." Tex. Bus. & Com. Code Ann.

§ 26.01(b)

The Purchase Agreement is an agreement that is in writing and signed by Perry, Bajjali, and Wallace Trusts. Accordingly, the Plaintiffs' contractual causes of action are not barred by the Statute of Frauds. The blanket Statute of Frauds defense raised by Perry is inapplicable to the provisions contained in the Purchase Agreement, and no additional evidence supports the defense.

### 4.  *Business Judgment Rule*

Perry's use of the business judgment rule as a defense fails because the business judgment rule does not apply to partnership decisions made by partners in a partnership. "The formulation of the business judgment rule in Texas . . . protects the decision of *disinterested* [corporate] directors unless there is evidence of ultra vires or fraudulent conduct." *Floyd v. Hefner*, 556 F. Supp. 2d 617, 650 (S.D. Tex. 2008); *see also Hoffman v. Kramer*, 362 F.3d 308, 317 n.4 (5th Cir. 2004) (noting that generally, the business judgment rule prevents courts from questioning the business judgment of corporate directors). Here, Perry was not a corporate director; he was a partner in a partnership. Therefore, the business judgment rule is inapplicable as a defense.

In the alternative, even if the Texas business judgment rule does apply to a general partner in a partnership, it is still not a valid defense for Perry. The business judgment rule will protect the decisions of only a *disinterested* director. *Floyd*, 556 F. Supp. 2d at 650. Disinterested is defined as "[f]ree from bias, prejudice, or partiality; not having a pecuniary interest." Black's Law Dictionary 481 (7th ed. 1999). Perry is not disinterested. As evidenced throughout this Memorandum Opinion, Perry is not free from bias, prejudice, or partiality in relation to Wallace or Bajjali. Moreover, Perry did have a pecuniary interest in relation to his failure not to indemnify Bajjali or the Wallace Trusts, because indemnifying Bajjali and the Wallace Trusts would have required Perry to expend significant

resources in restructuring the loans. [Finding of Fact Nos. 102–106.] Accordingly, because Perry is not disinterested, the business judgment rule is inapplicable.

5.    *Failure of Consideration*

Perry asserts that the Plaintiffs' cause of action for breach of the Purchase Agreement is barred by the defense of failure of consideration. [Adv. Docket No. 87, p. 7, ¶ 22.] A complete failure of consideration constitutes a defense to an action on a written agreement. *See Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 614 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Failure of consideration occurs when the promised performance fails due to a supervening cause after an agreement is reached. *Stewart v. U.S. Leasing Corp.*, 702 S.W.2d 288, 290 (Tex. App.—Houston [1st Dist.] 1985, no pet.); *U.S. Bank, N.A. v. Prestige Ford Garland Ltd. P'ship*, 170 S.W.3d 272, 279 (Tex. App.—Dallas 2005, no pet.). This Court finds that there is nothing in the record that indicates the promised performance of payment failed because of a subsequent, supervening cause. Therefore, the Court concludes that the defense of failure of consideration is inapplicable.

6.    *Defense of Payment*

The defense of payment is inapplicable. The defense of payment requires all payments owed by a defendant to a plaintiff to have been made. *See State St. Capital Corp. v. Gibson Title, Inc.*, No. Civ.A.3:97-CV-1329-P, 1998 WL 907027, at *7 (N.D. Tex. Dec. 16, 1998) (denying the defense of payment when defendant had not made all payments). Although Perry told Tielke that Wallace and Bajjali had been paid in full, Perry has failed to provide any additional evidence on this point. [Finding of Fact No. 43.] This one statement alone, especially considering Perry's lack of credibility and the very credible testimony of both Wallace and Bajjali to the contrary, is woefully insufficient. Therefore, this Court concludes that the defense of payment is inapplicable.

109

7.    *Absolute or Qualified Privilege in Defamation*

Perry does not hold an absolute or qualified privilege in the defamatory statements he made.

Absolute privilege is analogous to an immunity because absolutely privileged communications are

not actionable and may not form the basis for civil liability. *Randolph v. Walker*, 29 S.W.3d 271, 278

(Tex. App.—Houston [14th Dist.] 2000, pet. denied).  For defamation purposes, an absolute privilege

attaches in the following circumstances:

> [When] communications [are] made in proceedings of legislative, executive, and
> judicial bodies, and to only a limited and select number of situations which involve
> the administration of the functions of the branches of government such as the opinions
> of judges and the speeches of members of congress or legislatures. . . . All
> communications to public officials are not absolutely privileged.

*Clark v. Jenkins*, 248 S.W.3d 418, 431–32 (Tex. App.—Amarillo 2008, pet. denied) (citation

omitted); *see also Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987).  Absolute

privilege applies even if the communication was false and published with express malice. *Associated

Tel. Directory Publishers, Inc. v. Better Bus. Bureau of Austin, Inc.*, 710 S.W.2d 190, 192 (Tex.

App.—Corpus Christi 1986, writ ref'd n.r.e.).  Initial communications "to a public officer . . . who

is authorized or privileged to take action" are subject to only a qualified privilege, not an absolute

immunity.  *Hurlbut*, 749 S.W.2d at 768.

In this context, to be entitled to a qualified privilege, Perry's statements must have been made

in good faith and communicated only to persons having a common interest or duty in the subject

matter to which the communication relates.  *See Grant v. Stop-N-Go Mkt. of Tex., Inc.*, 994 S.W.2d

867, 874 (Tex. App.—Houston [1st Dist.] 1999, no pet.).   Qualified privilege justifies the

communication only when it is made without actual malice.  "Proof that a statement was motivated

by actual malice existing at the time of publication defeats the [qualified] privilege." *Randall's Food*

110

*Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (citing *Marathon Oil*, 682 S.W.2d at 631);

*Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 n.1 (Tex. Civ. App.—Tyler 1980,

no writ)).

Perry does not qualify for absolute privilege. He has introduced no exhibits nor adduced any

testimony indicating that his statements were made in any proceedings of legislative, executive, or

judicial bodies, nor were they communicated in a situation that involved the administration of the

functions of the branches of government. Perry did, however, make statements to public officials who

were authorized to take action. [Finding of Fact No. 91 & 92.] Therefore, while there was no

absolute privilege, Perry's defamatory statements are subject to a qualified privilege analysis.

Although Perry's communication to qualified public officials may be subject to a qualified

privilege analysis, his defense still fails. This Court has already concluded that Perry made the

defamatory statements with actual malice. Therefore, Perry has no qualified privilege in his

defamatory statements.

### 8.    All Conditions Necessary

Perry asserts that the Plaintiffs have not performed all of the conditions necessary for recovery

of their causes of action and the conditions have not occurred or transpired. [Adv. Docket No. 55, ¶

64.] However, the evidence shows unambiguously that the Plaintiffs did perform all of the conditions

necessary of the Purchase Agreement. For example, Wallace and Bajjali, among other actions,

relinquished their managerial positions related to Perry Properties. [Finding of Fact No. 38.]

Therefore, this Court finds this defense inapplicable.

### 9.    Excessive Demand as a Defense to Attorneys' Fees

A creditor who makes excessive demand upon a debtor is not entitled to attorneys' fees for

subsequent litigation required to recover the debt. *Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981).

Demand for damages may be considered excessive even though the amount is unliquidated. *Outdoor Sys., Inc. v. BBE, L.L.C.*, 105 S.W.3d 66, 73 (Tex. App.—Eastland 2003, pet. denied). Absent some evidence of unreasonableness or bad faith, however, a demand is not excessive merely because it is greater than that which is later demanded to be due at trial. *Essex Crane Rental Corp. v. Striland Constr. Co.*, 753 S.W.2d 751, 758 (Tex. App.—Dallas 1998, writ denied).

Because Perry has failed to introduce exhibits or adduce testimony indicating unreasonableness or bad faith on the part of the Plaintiffs, this Court finds excessive demand as a limitation on attorneys' fees inapplicable.

> ### 10.   *Novation*

Bajjali's cause of action for breach of the Indemnification Clause is not barred by the defense of novation. A novation is "the substitution of a new agreement between the same parties or the substitution of a new party on an existing agreement." *Honeycutt v. Billingsly*, 992 S.W.2d 570, 576 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). "A novation agreement need not be in writing or evidenced by express words of agreement, and an express release is not necessary to effect a discharge of an original obligation by novation." *Flanagan v. Martin*, 880 S.W.2d 863, 867 (Tex. App.—Waco 1994, writ dism'd w.o.j.). Specifically, a novation can be "an inference from the acts and conduct of the parties and other facts and circumstances." *Chastain v. Cooper & Reed*, 257 S.W.2d 422, 423 (Tex. 1953) (citing *Com. Nat'l Bank of San Antonio v. Poulos*, 8 S.W.2d 222, 224 (Tex. Civ. App.—San Antonio 1928, no writ)). Specifically, novation requires "(1) a previous, valid obligation; (2) a mutual agreement of all parties to the acceptance of a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract." *Flanagan*, 880 S.W.2d

at 867.

While this Court acknowledges that the first prong of novation is applicable, the Wallace-Bajjali Partnership's decision to restructure the loans was not based upon a mutual agreement with Perry, thus failing to satisfy the second prong. There is no evidence of a mutual agreement between the parties accepting the debt restructuring as a new contract. In fact, Perry has testified that it is his intention to continue to honor his obligations under the Purchase Agreement. [Finding of Fact Nos. 84 & 85.] Perry also testified that he would pay any debt that he may owe Wallace and Bajjali under the Indemnification Clause. [Finding of Fact No. 86.] Furthermore, Wallace testified that Perry never gave him an indication that he would dishonor the obligations under the Purchase Agreement. [Finding of Fact No. 87.]

Second, there is no evidence that Bajjali intended to extinguish the obligations created by the Purchase Agreement. In 2008, the Wallace-Bajjali Partnership Fund assumed the debts of the the Fund. [Finding of Fact No. 100.] Because of the Fund's dismal financial state, the Wallace-Bajjali Partnership decided to restructure the Fund's loans with the intent to placate the Fund's creditors and avoid foreclosure on all of the properties. [Finding of Fact No. 98.] Moreover, there is no evidence of the validity of any new contract.

In sum, the Wallace-Bajjali Partnership's decision to restructure the loans was not based upon a mutual agreement with Perry, and there is no evidence that the Wallace-Bajjali Partnership's debt restructuring was intended to absolve Perry from the obligations of the Purchase Agreement. Thus, the Wallace Trusts and Bajjali's claims for breach of the Indemnity Clause are not barred by the defense of novation.

11.    *Waiver*

Waiver is an affirmative defense proven by showing a party's "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (quoting *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)) (internal quotation marks omitted).  It is the movant's burden to show waiver. *See El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).  In determining if waiver has occurred, "a court must examine the acts, words, or conduct of the parties, and it must be 'unequivocally manifested' that it is the intent of the party to no longer assert its right." *Robinson v. Robinson*, 961 S.W.2d 292, 299 (Tex. App.—Houston [1st Dist.] 1997, no writ).

This Court concludes that the defense of waiver to the breach of contract claim must fail. Perry did not meet his burden in showing that the Plaintiffs "unequivocally manifested" an intention to no longer assert their rights under the Purchase Agreement.  Perry introduced no evidence, and adduced no testimony, showing that the Plaintiffs, through their words or actions, manifested an intention to waive their rights under the Purchase Agreement.  Indeed, they have vigorously asserted their rights under the Purchase Agreement.  Therefore, the defense of waiver does not apply.

12.    *Mitigation of Damages*

The Plaintiffs have not failed to mitigate their damages. "The mitigation-of-damages doctrine is an affirmative defense that requires an injured party, following a breach, to exercise reasonable care to minimize his damages if it can be done with slight expense and reasonable effort." *Allen v. Am. Gen. Fin., Inc.*, 251 S.W.3d 676, 686 (Tex. App.—San Antonio 2007, pet. granted) (citing *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995)).

114

Mitigation of damages requires a plaintiff to exercise "ordinary care" in minimizing his damages. *Formosa Plastics*, 216 S.W.3d at 459. In a contract dispute, the party who breached the contract has the burden of proving to what extent the damaged party could have mitigated damages. *See Copenhaver v. Berryman*, 602 S.W.2d 540, 544 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.) (citing *Houston Chronicle Pub. Co. v. McNair Trucklease, Inc.*, 519 S.W.2d 924, 929 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.)).

Perry has not met his burden of proving a lack of mitigation and the amount of damages that increased due to lack of mitigation. Perry produced no exhibits, and adduced no testimony, showing that Bajjali failed to mitigate his damages. Indeed, Bajjali mitigated his damages when he caused the Wallace-Bajjali Partnership to assume the debt of the Fund in 2008. [Finding of Fact No. 100.] Therefore, this Court concludes that damages were mitigated in relation to the breach of the Indemnification Clause.

This Court also finds that Perry failed to introduce any exhibits, or adduce any testimony, that Wallace and Bajjali were presented with opportunities to mitigate damages relating to the breach of the Nondisparagement Clause. Further, it is unlikely that Wallace and Bajjali could have done anything to mitigate those damages, as their reputations were immediately tarnished. Finally, the record does not contain any evidence of the amount of damages that could have been avoided by the Plaintiffs' failure to mitigate. For all of these reasons, failure of mitigation is not a defense to the breach of the Nondisparagement Clause.

### 13.   Merger and the Parol Evidence Rule

The parol evidence rule does not bar the Plaintiffs' contractual causes of action. The parol evidence rule prohibits the admittance of extrinsic evidence to vary or explain the terms of a contract

or the legal effect of an unambiguous contract, except under the following circumstances: (1) there was fraud; (2) an accident occurred; or (3) there was a mistake in the preparation of the contract. *Johnson v. Driver*, 198 S.W.3d 359, 363 (Tex. App.—Tyler 2006, no pet.).

Perry asserts that the parol evidence rule should bar all evidentiary support for the Plaintiffs' claims because the merger doctrine states that all referenced agreements are in writing. [Adv. Docket No. 55, ¶ 61.] Under the doctrine of merger, a prior contract merges with a subsequent contract when "the same parties to an earlier agreement later enter into a written integrated agreement covering the same subject matter." *Fish v. Tandy Corp.*, 948 S.W.2d 886, 898 (Tex. App.—Fort Worth 1997, writ denied). The merger doctrine simply triggers the parol evidence rule. *Tri-Steel Structures, Inc. v. Baptist Found. of Tex.*, 166 S.W.3d 443, 451 (Tex. App.—Fort Worth 2005, pet denied). In order for the parol evidence rule to apply, the terms of the contract in question must be unambiguous. *Johnson*, 198 S.W.3d at 363. This Court concludes that the Purchase Agreement is unambiguous. The evidence presented by the Plaintiffs, however, does not vary or contradict the terms of the Purchase Agreement.   Thus, the parol evidence rule does not bar the Plaintiffs' causes of action.

## VI. CONCLUSION

For the reasons set forth above, this Court concludes the following: (1) the Wallace Trusts do not have standing to sue; in the alternative, even if they do have standing to sue, they may not recover actual damages and attorneys' fees even though Perry breached the Indemnification Clause in relation to the Wallace Trusts and breached his fiduciary duties in relation to the Wallace Trusts; (2) Wallace, in his individual capacity, was not a party to the Purchase Agreement, and therefore Perry did not breach the Indemnification Clause or the Nondisparagement Clause in relation to Wallace; (3) Perry breached the Indemnification Clause in relation to Bajjali and is liable for actual damages and

116

attorneys' fees; (4) in the alternative, Perry breached his fiduciary duty in relation to Bajjali and is therefore liable for actual damages;[50] (5) Perry breached the Nondisparagement Clause in relation to Bajjali, but Bajjali failed to adequately prove up damages; (6) Perry defamed Wallace and is liable for general damages and punitive damages; (7) Perry defamed Bajjali and is liable for general damages and punitive damages; and (8) Perry is not liable to any of the Plaintiffs for fraud or fraudulent inducement with respect to the Purchase Agreement.

This Court also concludes that the following damage awards are non-dischargeable pursuant to 11 U.S.C. 523(a)(6): (1) actual damages, plus reasonable attorneys' fees and expenses ; (2) actual defamation damages in relation to Bajjali; (3) punitive defamation damages in relation to Bajjali; (4) actual defamation damages in relation to Wallace; and (5) punitive defamation damages in relation to Wallace.

In sum, based upon the conclusions set forth immediately above, and the entire record in this Adversary Proceeding, including all of the findings of fact and conclusions of law set forth herein, this Court awards the following:

(A)    To Bajjali: (1) $3,780,315.00 (non-dischargeable), plus reasonable attorneys' fees and expenses (non-dischargeable)[51] for breach of the Indemnification Clause; (2) $25,000.00 (non-dischargeable) in actual defamation damages; and (3) $25,000.00

---

[50]   Even if the Indemnification Clause did not exist, this Court would find the same amount of damages, i.e., the amount of damages for breach of the Indemnification Clause, for both Bajjali and the Wallace Trusts under a theory of breach of fiduciary duties; Bajjali would receive $3,380,315.00 in actual damages and the Wallace Trusts would receive $0. However, no attorneys' fees would be awarded to Bajjali. Additionally, these damages would be non-dischargeable pursuant to 11 U.S.C. 523(a)(6) in relation to Bajjali only.

[51]   "When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damage, including post-judgment interest, are likewise nondischargeable." *Gober v. Terra+Corp. (In re Gober)*, 100 F.3d 1194, 1208 (5th Cir. 1996) (citing *Stokes v. Ferris (In re Stokes)*, 150 B.R. 388, 393 (W.D. Tex. 1992))

117

(non-dischargeable) in punitive defamation damages.  In total, this Court awards Bajjali $3,830,315.00 in non-dischargeable damages, plus reasonable attorneys' fees and expenses (also non-dischargeable).  Counsel for Bajjali is directed to submit his firm's invoices to the Court within seven calendar days of the date that this Memorandum Opinion is entered on the docket.  Further, counsel for Bajjali is to submit invoices to Perry's counsel within seven calendar days from the date that this Memorandum Opinion is entered on the docket so that he can determine whether he agrees that the requested fees and expenses are reasonable or whether a separate hearing needs to be held on the reasonableness of the requested attorneys' fees and expenses.

(B)     To Wallace: (1) $100,000.00 (non-dischargeable) in actual defamation damages; and (2) $100,000.00 (non-dischargeable) in punitive defamation damages.  In total, this Court awards Wallace $200,000.00 in non-dischargeable damages.  Wallace is not entitled to any attorneys' fees and costs.

(C)     To the Wallace Trusts: —$0—

A judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed on this 3rd day of February, 2010.

Jeff Bohm
United States Bankruptcy Judge

118